**KOMMANVITTSELSKAPET HARWI (ROLF WIGAND) Owner of the MOTOR VESSEL, GERWI**

v.

**UNITED STATES of America.**

**No. 39 of 1964.**

United States District Court
E. D. Pennsylvania.

Sept. 8, 1969.

Richard W. Palmer, and Raul Betancourt, Jr., Rawle & Henderson, Philadelphia, Pa., for plaintiff.

Drew J. T. O'Keefe, U. S. Atty., and Joseph R. Ritchie, Jr., Asst. U. S. Atty., Philadelphia, Pa., Thomas F. McGovern, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for defendant.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW, AND ORDER

WOOD, District Judge.

The libellants brought suit under Section 2 of the Suits in Admiralty Act, 46 U.S.C. § 742 for damages incurred by the freighter GERWI when it grounded on a shoal in the Torresdale Range of the Delaware River while carrying iron ore to the Morrisville Plant of the United States Steel Company. Libellants contend that the United States Government negligently caused the grounding because it failed to regularly survey and dredge a 25' channel in the Torresdale Range, because it failed to notify users of the Delaware River that such channel was not regularly surveyed or maintained, because it failed to publish current information as to the depth of the 25' channel, and because it failed to mark a separate 40' channel (which was then in the process of construction) with temporary markers so that it could be navigated. After reviewing the record of trial held from September 18 to September 25, 1968, and the briefs and proposed find-

ings of fact and conclusions of law submitted by the parties, and hearing argument, we have concluded that the Government is not liable under any of the theories urged upon us by the libellants. Accordingly, we have made the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Kommanvittselskapet Harwi (Rolf Wigand) is a foreign business corporation organized and existing under the laws of Belgium.

2. On May 23, 1963, Kommanvittselskapet Harwi was the owner of the motor vessel GERWI, a Norwegian flag bulk carrier, 562' in length and 72' in breadth.

3. Bergens Skibsassuranseforening of Bergen, Norway, a Norwegian underwriter and added libellant in this action, was hull underwriter of the GERWI on May 23, 1963.

4. On May 23, 1963, the GERWI was under long term time charter to Emerald Shipping Corporation, who had voyage chartered the vessel to Canadian Foreign Steamship Company for one voyage to carry iron ore from South America to the United States Steel Company at Morrisville, Pennsylvania.

5. The GERWI discharged 7,075 tons of ore at Pier 122 South, Philadelphia in order to reduce her draft before transiting the Delaware River to Morrisville.

6. On May 23, 1963, at about 12 o'clock noon, the GERWI left Pier 122 for Morrisville with 15,349 tons of iron ore remaining on board; her draft was 27' 11" forward and aft, as observed in fresh water at Pier 122 South.

7. The compulsory pilot assigned to the GERWI, R. A. Lappe, was at the time herein considered duly licensed by the State of Pennsylvania to pilot ships of foreign registry up the Delaware River. (N.T. 24-8)

8. The decision of how much draft any given ship might take up the Delaware was the responsibility of the individual pilot. (N.T. 531)

9. Pilot Lappe had expected to have a depth of 29'9" plus four feet of high tide on this Torresdale Range, giving a depth of 34 feet available for a 27'11" draft vessel. (N.T. 37)

10. The GERWI proceeded upriver in fair sunny weather with a light 5-6 knot wind. Visibility was excellent. (N.T. 33)

11. The master of the GERWI, Captain O. Kalve, was concerned about the tide and before leaving Pier 122S asked the pilot, R. A. Lappe, about the height of the tide and was assured that they would have at least three feet over mean low water. (R. 176, 180)

12. The GERWI reached the Tacony-Palmyra Bridge above Philadelphia at 1309 (e. g. 1:09 p. m. where the tide was estimated by the pilot Lappe to be four feet above mean low water. (N.T. 58-9)

13. The pilot Lappe had decided to navigate the Torresdale Range area through the old or 25' channel rather than the new or 40' project channel. At this time the 25' channel was marked with range lights and the 40' project channel was not so marked.

14. Before entering Torresdale Range, the pilot Lappe attempted without success to establish radio contact with a flotilla consisting of a dredge and a drill working in the river channel in Torresdale Range. (N.T. 43)

15. Thereafter and before the GERWI entered Torresdale Range, the Coast Guard cutter Zinnia responded by radio to the GERWI advising the pilot to pass the flotilla on the Pennsylvania side of the range. (N.T. 45-6)

16. The pilot stopped the vessel's engines to turn into the 25' or old range and then shaped up on the centerline of the range lights and buoys in the channel. The GERWI was then brought to the left half of the channel or Pennsylvania side to clear the dredge President

and the drill, which was in the New Jersey half of the channel. (N.T. 46–7)

17. The GERWI touched bottom at 1325, e. g., 1:25 p. m.) in the left half of the 25′ channel.

18. It is uncertain whether the shoal upon which the GERWI was grounded was man-made (and thus perhaps a result of the dredging operation nearby) or whether it was an upcropping of a natural formation.

19. At the time the vessel grounded, the GERWI's starboard side was lined up on the range lights in the old or 25′ channel so that it was in the left or Pennsylvania half of the existing channel. (N.T. 193–4)

20. After the grounding, the GERWI proceeded without further incident to Morrisville where her cargo was discharged. (N.T. 196–7)

21. The GERWI then went into drydock at Sun Ship Building and Drydock Company, Chester, Pennsylvania, on May 25, 1963 and remained there until June 11, 1963 undergoing repairs. (N.T. 197, L–23, 24)

22. The cost of repairs and necessary incidental expenses totaled $203,710.46. Libellant's claim as stated in L–26, in the total amount of $203,710.46, of which Skibs Bergens has paid $170,015.03 and Rolf Wigands has paid $33,695.43, was reduced as follows:

| | | |
|---|---|---|
| Item 27 | Disallowed | $1,166.08 |
| Item 35 | Duplication of item 27 | 1,165.71 |
| Total disallowed | | $2,331.79 |

The total amount claimed is thus $201,378.67.

(N. T. 218–227)

———◆———

23. During the period relevant to this litigation, it was the practice of the Army Corps of Engineers stationed in the area of the Torresdale Range to publish statements from time to time which stated the results of sweeps of certain areas of the upper Delaware which the Engineers deemed necessary or potentially helpful to navigation in general. There was no program and no order directing the engineers to dredge or sweep any given channel at any given time or at any given interval. The activities of the Engineers in any given channel in this regard were limited by available manpower and financial resources, and by priorities established by other assignments. It was the practice of the Engineers to publish and mail or occasion to parties interested in navigation information regarding such matters as the progress of a new project channel or the results of a recent sweep conducted of an existing channel. During the period here considered, the Corps of Engineers was assigned and authorized to complete the construction of the 40 foot project channel in Torresdale Range. (N.T. 449–470)

24. Prior to and during May 1963, there was a considerable demand by parties interested in navigating the upper Delaware River upon the United States Army Corps of Engineers for information concerning the new project or 40 foot channel in Torresdale Range. Although range lights had not yet been installed and the channel had not been deepened to 40 feet in all places, the channel was being used by some navigators. (N.T. 454–8)

25. Prior to the accident, neither the United States Corps of Engineers nor any other instrumentality of the United States Government had any notice of the existence of a shoal in this area. (N.T. 410, 607)

26. The following depth chart was released by the United States Army Corps of Engineers on May 3, 1963, and mailed to a number of interested navigators:

U. S. ARMY ENGINEER DISTRICT, PHILADELPHIA
CORPS OF ENGINEERS
Custom House – 2nd & Chestnut Sts.
Philadelphia 5, Pa.

NAPOF-N                                                                3 May 1963

| DELAWARE RIVER, PENNSYLVANIA AND NEW JERSEY Ship Channel from Allegheny Ave., Phila. Pa., to Penna. R. R. Bridge, Trenton, New Jersey | | | | Minimum depths in channel entering from seaward | | | | |
| PROJECT | | | | | | | | |
| Name of Channel Range | Date of Survey | Feet Width | Miles (Naut) Length | Feet Depth | Left Channel Edge Feet | Left Outside Quarter Feet | Middle Half of Channel Feet | Right Outside Quarter Feet | Right Channel Edge Feet |
|---|---|---|---|---|---|---|---|---|---|
| Harbor | 16 Oct 62 | 400 | 0.70 | 40 | 34.1 | 37.7 | 40.8 | 40.8 | 38.6 |
| Fisher | 16 Oct 62 | 400 | 0.31 | 40 | 38.5 | 39.8 | 39.9 | 43.5 | 43.6 |
| Draw | 17 Oct 62 | 400 | 0.74 | 40 | 35.9 | 35.9 | 40.3 | 40.9 | 41.1 |
| Delair | 17 Oct 62 | 400 | 0.98 | 40 | 39.1 | 39.6 | 40.1 | 39.5 | 37.6 |
| Bridesburg | 12 Mar 63 | 400 | 0.31 | 40 | 41.5 | 41.2 | 40.5 | 42.8 | 42.2 |
| Frankford | 14 Mar 63 | 400 | 1.05 | 40 | 37.8 | 39.6 | 41.2 | 41.0 | 36.2 |
| Tacony | 14 Mar 63 | 400 | 1.17 | 40 | 40.1 | 40.1 | 42.0 | 41.7 | 41.7 |
| Torresdale (B)(C) | 7 Nov 62 | 400 | 1.39 | 40 | 30.6 | 37.2 | 33.1 | 29.9 | 37.1 |
| Mud Island (B)(C) | 9 Nov 62 | 400 | 1.67 | 40 | 34.1 | 33.8 | 28.8 | 30.0 | 24.5 |
| Enterprise | 19 Mar 62 | 400 | 1.70 | 40 | 38.1 | 42.3 | 41.4 | 41.1 | 37.3 |
| Beverly | 10 May 62 | 400 | 0.65 | 40 | 33.3 | 37.2 | 35.2 | 32.6 | 30.1 |
| Edgewater | 10 May 62 | 400 | 1.37 | 40 | 30.7 | 35.3 | 37.1 | 37.1 | 34.5 |
| Devlin (C) | 10 May 62 | 400 | 1.03 | 40 | 31.2 | 37.7 | 38.2 | 38.2 | 25.2 |
| Lehigh | 29 Aug 62 | 400 | 0.66 | 40 | 42.7 | 42.2 | 42.3 | 42.2 | 42.2 |
| Canal | 29 Aug 62 | 400 | 0.19 | 40 | 44.2 | 43.3 | 43.7 | 43.3 | 43.3 |
| Bristol | 30 Mar 62 | 400 | 0.62 | 40 | 40.8 | 42.4 | 42.1 | 42.4 | 41.4 |
| Keystone (A)(C) | 14 Dec 62 | 300 | 0.45 | 25 | 21.5 | 21.1 | 23.8 | 23.5 | 22.5 |
| Landreth (A)(C) | 14 Dec 62 | 300 | 0.41 | 25 | 20.5 | 22.3 | 26.3 | 26.9 | 26.5 |
| Landreth | 27 Mar 63 | 400 | 0.81 | 40 | 41.5 | 41.7 | 41.5 | 38.3 | 36.3 |
| Riverview | 27 Mar 63 | 500 | 0.20 | 40 | 41.5 | 41.7 | 42.0 | 37.9 | 33.6 |
| Foundry | 27 Mar 63 | 500 | 0.22 | 40 | 38.3 | 42.3 | 42.0 | 32.8 | 27.5 |
| Church | 27 Mar 63 | 500 | 0.19 | 40 | 38.3 | 41.3 | 39.1 | 28.3 | 22.5 |
| Florence | 4 Apr 63 | 400 | 1.34 | 40 | 31.4 | 33.3 | 36.3 | 33.3 | 29.9 |
| Roebling | 28 Mar 63 | 400 | 0.34 | 40 | 31.9 | 33.1 | 37.6 | 40.1 | 29.9 |
| Kinkora | 9 Apr 63 | 400 | 1.15 | 40 | 33.9 | 35.1 | 36.0 | 27.1 | 34.1 |
| Penn | 10 Apr 63 | 450 | 0.35 | 40 | 29.3 | 31.8 | 39.3 | 27.1 | 32.5 |
| Newbold | 10 Apr 63 | 400 | 0.52 | 40 | 20.9 | 22.6 | 23.6 | 14.2 | 10.2 |
| Blake | 25 Jan 62 | 400 | 0.17 | 25 | 21.7 | 20.6 | 21.6 | 26.3 | 29.1 |
| Whitehill | 29 Jan 62 | 300 | 1.03 | 25 | 19.4 | 19.4 | 19.8 | 19.5 | 20.9 |
| Raritan | 27 Feb 62 | 400 | 0.24 | 25 | 17.4 | 17.6 | 22.9 | 26.4 | 25.4 |
| Bordentown | 30 Jan 62 | 300 | 0.65 | 25 | 11.9 | 12.7 | 14.2 | 21.6 | 22.0 |
| Duck Island | 4 Mar 62 | 300 | 1.25 | 25 | 8.0 | 9.3 | 11.2 | 12.6 | 13.0 |
| Periwig | 2 Mar 62 | 400 | 0.24 | 25 | 9.5 | 12.0 | 13.8 | 14.3 | 13.3 |
| Biles Island | 1 Mar 62 | 300 | 0.38 | 25 | 21.5 | 23.5 | 19.5 | 16.7 | 13.5 |
| Cochran | 3 Mar 62 | 300 | 0.31 | 25 | 18.3 | 25.6 | 17.7 | 14.5 | 10.3 |
| Moon | 3 Mar 62 | 500 | 0.19 | 25 | 7.3 | 9.0 | 19.6 | 21.5 | 19.0 |
| Trenton | 3 Mar 62 | 500 | 0.20 | 25 | 10.5 | 13.2 | 14.7 | 14.3 | 13.8 |
| Trenton | 24 Aug 55 | 200 | 0.33 | 12 | – | – | 12.0 | – | – |
| Lalor | 24 Aug 55 | 200 | 0.16 | 12 | – | – | 15.2 | – | – |
| Landing | 24 Aug 55 | 200 | 0.20 | 12 | – | – | 10.4 | – | – |
| American | 24 Aug 55 | 200 | 0.21 | 12 | – | 14.7 | 14.3 | – | – |
| Federal | 24 Aug 55 | 200 | 0.09 | 12 | – | 7.1 | 15.5 | – | – |
| Bridge | 24 Aug 55 | 200 | 0.08 | 12 | – | – | 14.0 | – | – |
| Auxiliary Channel East of Burlington Island | | | | | | | | | |
| Range I | 17 Apr 51 | 200 | 0.28 | 20 | 23.7 | 22.4 | 18.7 | 18.7 | 7.2 |
| Range S | 17 Apr 51 | 200 | 0.25 | 20 | 12.9 | 17.4 | 17.4 | 22.5 | 19.7 |
| Range L | 17 Apr 51 | 200 | 0.10 | 20 | 10.7 | 18.9 | 18.9 | 22.6 | 18.7 |
| Range A | 17 Apr 51 | 200 | 0.19 | 20 | 8.7 | 18.7 | 18.7 | 22.6 | 18.7 |
| Range N | 17 Apr 51 | 200 | 0.12 | 20 | 11.2 | 19.7 | 19.7 | 24.4 | 23.7 |
| Range D | 17 Apr 51 | 200 | 0.09 | 20 | 12.7 | 20.4 | 20.4 | 23.7 | 16.7 |
| In front of Turning Basin | 17 Apr 51 | 200 | 0.18 | 20 | 13.5 | 13.4 | 13.4 | 18.5 | 20.7 |

NOTE: All depths refer to local mean low water.
Maps showing the depths of channel are sold to the public at the cost of reproduction. Requests for such maps, including the locality desired, should be made to the District Engineer.

(A) Old Channel
(B) Dredged to 35 feet, except over rock areas
(C) Dredging to 40 ft. in progress

[A256]

DAVID N. HUTCHISON
Major, CE
Acting District Engineer

27. Pilot Lappe read and understood the depth shown in the Engineers' Channel Statement of May 3, 1963, (Ex. L–9) as referring to the old or 25′ channel which was still marked by range lights and buoys which, he concluded, allowed 29.9 feet on the range and then allowed four more feet for the tide. (N.T. 121)

28. The fact that the new or 40′ channel and the old or 25′ channel on Torresdale Range were not coincident was common knowledge among shipping and navigation interests concerned with the upper Delaware River. (N.T. 459–60)

29. Pilot Lappe did not have nor did he inspect at the Pilots Association the Survey Sheet of November 7, 1962, prepared by the Corps of Engineers (R–I) on which it clearly appears that the old (25′) and the new (40′) Torresdale Range are separate and do not coincide. (N.T. 165) Pilot Lappe, however, knew prior to May 23, 1963, that there was an old channel and a new project channel in the Torresdale Range area and that these channels were not coincident, and he did not need the Survey Sheet of November 7, 1962 (R–I) to apprise him of this fact. (N.T. 165)

30. The Fairless plant of the United States Steel Corp. at Morrisville had located in it an office of Norton, Lilly & Co., in which the times of arrival of ore fleets at Morrisville were scheduled. In November 1960 the controlling depth for carriers operating under pilotage was 24′6″. There was no formal upriver committee as such until May 12, 1963, when the Board of Directors of the Pilots Association designated two pilots members. Prior to that time the pilots had liaison representatives who were not authorized to bind the pilots. (N.T. 520, 572) On May 10, 1963, Captain Powell of Norton, Lilly met with the Pilots Association on increasing the draft to 28 feet. He showed them an overlay, copied by him and unwittingly misaligned and then reproduced, which erroneously showed the new 40′ channel in Torresdale Range aligned with the old 25′ channel. Pilot Lappe was not at this meeting. (Deposition of Powell, 48–53; 587).

31. Pilot Lappe had no personal knowledge that the Powell overlay was posted at the Pilots Association office but Captain Powell had personally shown him the overlay when either the EDERA arrived or when the RIO ORINOCO arrived at Morrisville two or three days before the GERWI grounding on May 23 (N.T. 151). The Powell overlay had in fact been posted on the bulletin board at the Pilots Association. (N.T. 146)

32. The first 28′ draft ship which sailed from Philadelphia to Morrisville was the ORE VENUS on May 12, 1963 — 28′; followed by the GALASSIA on May 13, 1963 — 28′; third the RIO ORINOCO on May 18, 1963 — 28′; fourth the EDERA on May 21, 1963 — 28′. The GERWI was the fifth 28′ ship (Powell Deposition 56).

33. Pilot Lappe had taken both the RIO ORINOCO on May 18 and the EDERA on May 21 up the Torresdale Range. (N.T. 137–8)

34. In October 1962, Captain Powell had reported a shoal or grounding by the TYME ORE on the New Jersey side of the Torresdale Range, and the United States Corps of Engineers sounded this area on October 4, found a shoal, had the shoal removed by a contractor and swept it again on October 19, 1962. (N.T. 417)

35. Aside from soundings taken in 1962, the depth of the old e. g. 25′ channel was not maintained by the Corps of Engineers after 1957, and statements reporting the depths of the old channel were not published after January 1957. (N.T. 388–9)

36. On November 20, 1958, the following document (quoted in relevant part) was distributed by the United States Army Corps of Engineers to its District offices:

"PROJECT OPERATION

Navigation Lights, Aids to Navigation, Navigation Charts, Lake Survey Reports and Related Data Policy, Practice and Procedure

"1. *Purpose and Scope.* This manual prescribes the policy, practice and pro-

cedure to be used by all Corps of Engineers installations and activities in connection with navigation lights and other aids to navigation, chart data and Lake Survey reports. * * *

"3. *Cooperation with Coast Guard.* a. District Engineers will furnish direct to Coast Guard District Commanders information as to channel and harbor improvements which may require new aids to navigation or require changes to existing aids. This information will include: (1) Information as to the authorization by Congress of a project involving changes in channel limits, breakwaters, etc., including a copy of the project document; (2) the proposed operations on such projects during the next fiscal year, to be furnished annually on the release of the budget estimates; (3) plans showing the final location of the channel limits or structures to be furnished at the time work is undertaken. Changes in channel limits affecting navigation aids, made under general or specific provisions of law, should be made the subject of prior conference with the Coast Guard District Commander who will be promptly informed as to the approval of such changes and the probable date of completion of the work.

"b. District Engineers will furnish direct to the various Coast Guard District Commanders for their immediate information any facts which may come to their attention in connection with their duties which will be of benefit to the Coast Guard in maintaining its system of aids to navigation, including statements as to the displacement of or defects in any such aids to navigation. * *

"4. *Navigation Aids of the Corps of Engineers.* a. Whenever channel or other improvement is being prosecuted necessary temporary markers such as ranges, light poles, etc., should be installed and maintained by the District Engineer pending the installation of permanent aids by the Coast Guard. The Coast Guard desires that information regarding aids to navigation installed or maintained by District Engineers in connection with the works of harbor or channel improvement under their direction be furnished promptly in order that such information may be included in Notice to Mariners as published by the Coast Guard and be shown where desirable on the charts of the waters concerned.

"b. District Engineers will notify the Coast Guard District Commander, using for this purpose the special blank form CG–2554, in every case where aids to navigation for the purpose of marking works of harbor or channel improvement are established or discontinued. Notice should be given of such aids as may be of use or interest to general navigation, but need not be given as to such buoys, lights, or fog signals as are of temporary or unimportant character, or of importance only to the Corps of Engineers, nor as to lights or fog signals on ferry slips and on piers used only by certain vessels, nor as to stakes, bushes, and barrel buoys marking shallow and little-used channels. * * *

"6. *Information to be Furnished by the Corps of Engineers.* (Reports Control Symbol not required pursuant to paragraphs 17k and 17u, AR 335–15.)

"a. District Engineers having charge of improvements of harbors and waterways shown on charts of the Navy Hydrographic Office or of the Coast and Geodetic Survey will report harbor and waterway channel conditions promptly as ascertained, using prescribed standard tabular forms to the Hydrographer, Hydrographic Office, Navy Department, Washington 25, D. C.; Commandant and District Commanders, U. S. Coast Guard; the Director, U. S. Coast and Geodetic Survey, Washington 25, D. C. (in duplicate); and the Chief of Engineers, at-

tention: ENGWO. The standard tabular forms are as follows:

"(1) For channels 400 feet wide and greater, (Form No. 443).

| Name of Channel | Date survey | Project | | | Minimum depth in each ¼ width of channel entering from seaward | | | |
| | | | | | Mid-channel | | | |
| | | Feet width | Miles length | Feet depth | Left outside quarter feet | Left inside quarter feet | Right inside quarter feet | Right outside quarter feet |
| Tybee Range | 6–58 | 500 | 1.64 | 30 | 30 | 31 | 28 | 23 |
| Bloody Point | 6–58 | 500 | 2.81 | 30 | 30 | 30 | 29 | 25 |

\* \* \* \* \* \* \* \* \* \* \* \*

"c. The prompt dissemination of the latest detailed information concerning channel conditions is of utmost importance, and necessary measures will be taken to insure that such information is reported without delay simultaneously to the Hydrographic Office, the Coast Guard, and the Coast and Geodetic Survey. When a dangerous shoaling is found during the progress of a survey, information thereon will be furnished immediately to the above-mentioned agencies so that such information may be made available to mariners promptly and buoys shifted to mark the shoal. Descriptions of any dredging or other operations in important channels in tidal waters either in progress and not already reported, or soon to be undertaken, together with a statement of the work and expected duration, will also be reported in order that naval and other vessels may be warned to look out for dredges and other plant, temporary markers and lights."

## DISCUSSION

As previously stated the libellants have advanced four theories upon which they assert the government should be held liable for negligently causing damage to the GERWI. We will consider these *seriatim* in the order that they appear in the libellants' "Main Brief After Trial."

I. It is first contended that the government assumed the duty of regular maintenance and surveillance of the 25' or old channel and engendered reliance thereon by navigators, and that the failure of the government to carry out these duties caused the grounding of the GERWI. In this respect the libellants direct us to statutes relating to navigable waterways as well as to cases in which government maritime agencies have been held liable for negligence on navigable waterways.

We are unaware of any statutory requirement that the United States Corps of Engineers or any other agency of the United States Government survey and maintain the 25' channel in Torresdale Range at regular and frequent intervals. It is true, as the libellants point out, that Congress has the general power to regulate navigable waterways in interstate or foreign commerce. Constitution, Art. 1, Section 8, cl. 3. But this grant of power certainly is not an assumption of the duty to make all interstate waterways navigable. Title 33 U.S.C. §§ 401 and 403, also cited by the libellants, merely provide that bridges, causeways, dams or other substantial obstructions upon such waterways may not be constructed without the approval of Congress, the Chief of Engineers and the

Secretary of the Army. Title 14 U.S.C. § 2 and § 81 gives the Coast Guard general authority to "develop, establish, maintain and operate * * * aids to maritime navigation, * * *." on such waterways. But we do not infer from these general statutes the duty to maintain depth on Torresdale Range.

The case authority cited to us by libellants generally restates in a maritime context the familiar torts principle that one who undertakes, gratuitously or otherwise to render service to another is subject to liability for failure to exercise reasonable care if harm is suffered because of another's reliance upon the undertaking.[1] As the Supreme Court stated in Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955):

> "The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light * * * and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable * *." (350 U.S. at p. 69, 76 S.Ct. at pp. 126–127)

See also United States v. Sandra & Dennis Fishing Corp., 372 F.2d 189 (1st Cir. 1967) (negligent rescue); United States v. DeVane, 306 F.2d 182 (5th Cir. 1962) (negligent rescue); United States v. Lawter, 219 F.2d 559 (5th Cir. 1955) (negligent rescue); Somerset Seafood Co. v. United States, 193 F.2d 631 (4th Cir. 1951) (negligent marking of wreck).

Granting this general principle, however, we do not think that the government ever assumed the duty to dredge and survey the 25′ channel on a regular basis, nor do we think that it did anything to mislead navigators into thinking that it had assumed such a duty. It was the practice of the Corps of Engineers stationed in the area of Torresdale Range to publish statements from time to time which showed the results of sweeps or dredges of certain specified areas of the upper Delaware River. (See Libellants' Exhibits L–7, L–9, L–10, L–12, L–13, L–16, L–17) These statements did not purport to be the results of a regular surveying; the date of the surveying and the range surveyed were specified. As a matter of fact the government did not survey the 25′ channel at Torresdale or other nearby channels on a regular basis. The officers of the Corps of Engineers testified that they did not provide such a service, and that they were limited in what they could do by their available resources and manpower. In the period preceding the grounding of the GERWI, the Corps of Engineers was engaged in deepening a separate channel in the Torresdale area to a 40′ depth. In the course of this deepening project, the Engineers published and distributed for the general information of navigators, statements which showed changes in the depth of the 40′ channel area. With the exception of a sounding taken in 1962 with a Bludworth fathometer following a grounding in the Torresdale area (cf. Libellants' Ex. 36), the 25′ channel had not been surveyed for approximately seven years. From all the evidence we conclude that the government undertook nothing more than to represent that it made surveys of certain ranges at certain times with certain specified results. The cases cited to us by the libellants are mostly instances where the government has undertaken to perform a single service on a single occasion; we cannot lightly presume the assumption of a duty which involves a costly course of conduct over an extended period and the undertaking of which would be tantamount to making

---

1. See Restatement of Torts 2nd (1965) § 323.

the government the virtual insurer of navigation on the Delaware.

■ Even assuming *in arguendo* that the government had assumed such a duty, the libellants have not carried their burden of convincing us that the failure to survey at some given interval was the cause of the grounding of the GERWI. It is uncertain when the shoal upon which the GERWI grounded was formed. Moreover, we were unable to determine whether the shoal was man-made or natural: the formation could have been caused either by reformation of the river itself, by the dredging operation that was taking place nearby, or for some other reason of which we·are not aware. Consequently, even if the government had surveyed the Torresdale 25′ channel, say, every year, we are not convinced that this would have averted the unfortunate accident of the GERWI.

II. The second theory advanced by the libellants in seeking to hold the government liable is that "the United States was negligent in failing to notify the users of the waterway that the existing channel in Torresdale Range as marked in May 1963, by range lights and buoys, was not being surveyed or maintained, and could not safely be used for navigation." (Libellants' Main Brief After Trial, p. 11) This argument is closely related to the first, and we are again confronted with an array of statutes, Coast Guard and Army Engineers regulations, and cases which we do not consider apposite in the insant case.

It is true, as the libellants suggest that, pursuant to Title 10 U.S.C. § 7392 and Title 44 U.S.C. § 213 the Secretary of the Navy is empowered, at his discretion and subject to regulations which he may prescribe, to publish "charts, maps, notices to mariners, tide tables * * * (etc.)" Pursuant to Title 33 U.S.C. §§ 557a and 557b the Chief of the Army Engineers is granted similar authority to publish information and to prescribe regulations for such publication. These enabling provisions do not, of course, re-

quire the publication of any notices to navigators. However, libellants place great emphasis on a document entitled "PROJECT OPERATION" published by the Corps of Army Engineers (L–42) which is characterized as a "manual" to prescribe the "policy, practice, and procedure to be used by all Corps of Engineers installations and activities in connection with navigation lights and other aids to navigation, chart data and Lake Survey reports." It is asserted that this document had the force of a regulation, and we are directed specifically to paragraph 6(c) page 5, which provides as follows:

"c. The prompt dissemination of the latest detailed information concerning channel conditions is of utmost importance, and necessary measures will be taken to insure that such information is reported without delay simultaneously to the Hydrographic Office, the Coast Guard, and the Coast and Geodetic Survey. When a dangerous shoaling is found during the progress of a survey, information thereon will be furnished immediately to the above-mentioned agencies so that such information may be made available to mariners promptly and buoys shifted to mark the shoal. Descriptions of any dredging or other operations in important channels in tidal waters either in progress and not already. reported, or soon to be undertaken, together with a statement of the work and expected duration, will also be reported in order that naval and other vessels may be warned to look out for dredges and other plant, temporary markers and lights."

The libellants apparently make two distinct arguments from these sources: first, that the government should have reported the shoaling in the 25′ or old channel; and second, that the Army Engineers should have known that navigators were depending upon publication of regular depth surveys of the 25′ channel, and it should have informed them that such surveys were no longer being performed or published.

■ The first argument quickly falls because we find that the government had no notice of the shoal upon which the GERWI grounded. Since we have already concluded as well that the government had no duty to drag the 25′ range at periodic intervals to discover the shoal, there was nothing which the government knew or should have known that it could have reported. Ingham v. Eastern Air Lines, Inc. and United States of America 373 F.2d 227 (2nd Cir. 1967) is therefore inapplicable.

■ The second argument falls as well because the Army Engineers, as previously stated, never undertook or represented themselves as undertaking, the responsibility of regularly surveying and dredging the 25′ channel; they simply dredged certain cities on certain occasions and reported the results to interested navigators. In any case, the document upon which the libellants rely (L–42) refers to "projects" that the Engineers are working on; the Engineers were working on the 40′ channel as a "project", but the 25′ channel was finished and was no longer a "project". Since the government never surveyed the 25′ channel regularly, never represented itself as doing so, and had no duty to do so, it follows that it had no duty to say that such surveys were being discontinued.[2]

III. The third argument advanced by the libellants which relies essentially upon the authority previously cited, is that "the United States was negligent in failing to publish information as to the depths of the existing Torresdale Range channel as then marked by range lights and buoys and outlined on all current navigation charts." (Main Brief After Trial, p. 17) Two related arguments in this respect are urged upon us: first, it is contended that Section 6c on page 5 of the "Project Operation Manual" of the Corps of Engineers (quoted *supra*) required publication of the depths in the 25′ or old channel, since that channel was the only one marked by range lights; secondly, it is urged that the Corps of Engineers negligently published a depth statement (e. g. Channel depth statement of May 3, 1963, Libellants' Exhibit 9) which, it is asserted, in fact related to the 40′ project channel but because it was not clarified on its face and because range lights were set up in the 25′ channel but not the 40′ channel, gave the misleading impression that it referred to depths in the 25′ channel. In regard to this latter contention, we are reminded that the pilot of the GERWI testified that he relied essentially on the May 3, 1963 depth statement in arriving at the erroneous conclusion that the 25′ or old channel was deeper than it was in fact, and further that there was testimony by several persons acquainted with nautical charts that when they looked at the May 3 statement (L–9) they would have thought that it referred to the 25′ channel marked by range lights.

■ We think that both of these arguments are without merit under the circumstances before us. With regard to the first, we find nothing in the Engineers Project Manual (L–42) which requires or even suggests that a statement should have been published for the 25′ channel. We have previously concluded that the Engineers did not have the duty to publish regular surveys of all ranges. The document referred to (L–42) is merely a statement of policy and procedure from a government agency to its operational staff. It refers to situations where the Engineers are working on "projects" or "improvements" such as they were performing in the 40′ channel but not in the 25′ channel. The specific section upon which libellants chiefly rely (e. g. 6c on page 5 of L–42, quoted *supra*) refers not to the prompt reporting and dissemination of all information with regard to all channels on a given

---

2. Even if this point were granted to the libellants, we still do not think that any failure in this respect was proven to be a cause in fact of the GERWI's grounding.

river, but rather to the prompt reporting and dissemination of specific conditions of which the Engineers become aware in the course of their work and which might create a danger to navigation. This section certainly cannot be construed to direct regular surveys of the 25′ channel on which the Engineers were not working, and from which they had no reason to suspect unusual shoaling at the time of the GERWI accident. Moreover, as previously stated, even if there were such a directive as the libellants supposed, we are not persuaded that it was a cause in fact of the GERWI grounding.

With respect to the libellants' second argument, we do not think that the government made any negligent misrepresentations in the May 3, 1963 (L–9) channel depth statement. We find it difficult to understand how a navigator, especially one familiar with the upper Delaware, could read this statement and conclude that it referred to the 25′ or old channel. In the column entitled "Project" the depth for the Torresdale project is listed as 40′. Footnote designation (A), which refers to the fact the channel project is being undertaken in the same area as an old channel in a given range, is not found in the column next to the one relating to Torresdale Range. It should therefore have been clear that there were two separate channels in Torresdale Range and that the May 3 statement (L–9) referred to the 40′ project range.

Even if one concluded, which we do not, that the May 3 depth statement was *ambiguous*, we do not think that this amounts to a negligent misrepresentation for which the government should be held liable. Certainly one could hardly expect to navigate the upper Delaware with a multimillion dollar ore shipment on the basis of the information contained on a single sheet which referred to documents or sources of information which might have clarified the situation.[3] In our

findings of fact we concluded from the evidence that it was common knowledge that there were at least two channels in Torresdale Range, namely the 40′ project and the old 25′ range, and that these two channels were not coincident. Moreover, there were other documents readily available from the government from which it could be determined that the two ranges took different courses: (a) the existence of separate channels could have been inferred from another notice also sent out on May 3, 1963 (Exhibit R–11) but relating to another channel, and (b) the statement of the November 7, 1962 survey could have clarified the situation. (See N.T. 166)

█ In any event, even assuming that the May 3, statement (e. g. Exhibit L–9) was *misleading* and that publication of it was negligent under the circumstances, the plaintiff has not carried his burden of convincing us that the GERWI, its crew and pilot, relied on the accuracy of this statement and that such reliance was a cause in fact of its grounding. The pilot, Lappe, did testify on several occasions that he relied primarily on the May 3 channel depth statement in deciding that he could take a ship with a 27′ 11″ draft up the channel marked by range lights on a 4′ tide. For reasons previously cited we find it difficult to comprehend how a pilot could take a large ore carrier up the Delaware in reliance of a one-page depth statement, even if he erroneously interpreted it to apply to the 25′ channel. Lappe testified that prior to May 23, 1963, he knew that there was a new project 40′ channel and an old 25′ channel in Torresdale and that the two channels were not coincident, and that he was aware of these facts independently of the May 3 statement. Knowing this it is even more difficult to understand how he could misconceive the May 3 statement which referred with respect to Torresdale Range, to a 40′ channel. His alleged reliance apparently comes down

3. The May 3, 1963, channel depth statement (L–9) included a footnote stating that "maps showing the depths of channel are sold to the public at the cost of

reproduction. Requests for such maps, including the locality desired, should be made to the District Engineer."

to the assertion that since the May 3 statement only referred to one channel and since only one channel had range lights, that the lighted channel must be the one referred to. In view of the pilot's knowledge, as well as the existence of other clarifying documents, we are dubious of this. Our doubts are heightened by Lappe's testimony regarding the so-called "Powell Overlay", a document prepared by Captain Powell of the Norton, Lilly office at Morrisville which erroneously and mistakenly misaligned the 25' channel so that it appeared to be a 29' channel. The pilot Lappe admitted that he had seen this document prior to May 23, 1963, but his testimony as to how long he looked at it was not clear. In interrogatories to counsel before trial, it was stated that Lappe had examined the Powell overlay on at least two occasions prior to boarding the GERWI (N.T. 578–9), but at trial he testified that he saw it only once and for ten or twenty seconds. (N.T. 127–8) In short, we do not think that the publication of the depth statement of May 3, 1963, was the cause of the GERWI's grounding.

IV. The libellants' final theory for casting liability on the government is that "the United States was negligent in failing to mark the 40' channel project with temporary markers such as ranges, light poles, etc." (Main Brief After Trial, p. 25) Apparently the argument here is that the government is liable for failure to install range lights on the 40' channel because it was required by the Corps of Engineers manual for "Project Operation" at Section 4b (p. 2 of Libellants' Exhibit 42) that "whenever channel or other improvement is being prosecuted necessary temporary markers such as ranges, light poles, etc. should be installed and maintained by the District Engineer pending the installation of permanent aids by the Coast Guard"; it is contended that the compulsory pilot could not prudently navigate any channel that

was not marked by range lights and buoys, but if the 40' channel had been marked with range lights in accordance with the directive cited above, no grounding would have occurred because the pilot could presumably have navigated the 40' channel without incident.

■ To the contrary, for a number of reasons we do not think that under the circumstances of this case liability may be imposed on the government because it had not installed range lights in the 40' channel at the time of the GERWI grounding. In the first place, under the statutes previously cited it is provided that the Coast Guard or the Engineers "may" set up range lights or other markers. It is therefore a matter of discretion for these agencies whether to set up range lights at all, and if so when and where to set them up. Consequently neither the Coast Guard nor the Engineers nor the government can be held liable for failure to have range lights set up at any given time. See Kline v. United States, 113 F.Supp. 298 (S.D.Tex.1953)[4]

■ The cited sections of the Engineers "Manual on Project Operation" (L–42) add nothing to the libellants' case. Even under the terms of the Manual, the District Engineer is given discretion to set up "necessary" markers in channels under construction. From the record before us we gather that efforts were being made by the Engineers in this direction at the time of the GERWI grounding. In any event, the Manual on Project Operations was nothing more than an internal directive concerning work to be done from the central administration of the Engineers to the District Engineer. The directions contained therein were of internal significance only to the Corps of Engineers and did not constitute the assumption of a duty to set up the lights toward outside parties who were not even aware of the directions and could therefore not have relied on them.

4. There was no representation to the parties here concerned that the range lights would be set up in the 40' channel by the time the GERWI reached Torresdale Range.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this case.

2. Neither the United States Government nor any agency thereof is liable to any of the plaintiffs for the damages incurred by the GERWI on May 23, 1963.

## ORDER

And now, this 8th day of September, 1969, it is ordered that judgment is entered in favor of the United States of America.