CANADIAN PACIFIC (BERMUDA) LIMITED, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant Third Party Plaintiff-Appellant,

v.

P. C. ELDEMIRE, Third-Party Defendant.

No. 75–1199.

United States Court of Appeals, Fifth Circuit.

July 12, 1976.

Rehearing and Rehearing En Banc Denied Sept. 17, 1976.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Rex E. Lee, Asst. Atty. Gen., Thomas L. Jones Dept. of Justice, Civ. Div., Washington, D. C., for U. S.

Joseph P. Milton, Jacksonville, Fla., for Canadian Pacific Ltd.

Before THORNBERRY and AINSWORTH, Circuit Judges, and HOFFMAN,* District Judge.

AINSWORTH, Circuit Judge:

This case grows out of the grounding of the M/V N. R. CRUMP at "Short Cut Turn" in the St. Johns River, a navigable waterway in Florida, maintained by the United States Army Corps of Engineers. The owner of the vessel, Canadian Pacific (Bermuda) Limited [Canadian Pacific], filed this complaint for damages against the United States under the Suits in Admiralty Act, 46 U.S.C. § 741 *et seq.*[1] alleging negligence of the United States acting through the Corps of Engineers in the proper maintenance of the waterway. After a nonjury trial, the District Court found that the negligence of the defendant was the sole proximate cause of the grounding and awarded judgment in favor of Canadian Pacific and against the United States in the amount of $32,283. The Government appeals.

---

* District Judge of the Eastern District of Virginia, sitting by designation.

1. The Suits in Admiralty Act provides in pertinent part:

   In cases where if such vessel were privately owned or operated . . . or if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States. 46 U.S.C. § 742.

The CRUMP is a diesel-powered vessel 597 feet in length with a maximum breadth of 93 feet. On the morning of December 6, 1971, after loading a cargo of phosphate, the CRUMP departed from her berth at Jacksonville Bulk Terminal on the St. Johns River and proceeded eastward toward the Atlantic Ocean. The departure was scheduled to coincide with the maximum high tide of the river. The forward draft after loading was 33 feet 6 inches; the stern draft, 34 feet 5 inches.[2] Captain Barry G. Roberts, master of the vessel, was on the bridge with Captain Eldemire, a member of the St. Johns Bar Pilot Association, who was piloting the vessel. As the CRUMP navigated through White Shells Cut, a section of the channel just west of Short Cut Turn, the dredge BILL BAUER was sighted close to the center line of the channel. Captain Eldemire radioed a request to the dredge and received permission to pass to its port or north side. The passing was accomplished by the dredge swinging south and the CRUMP swinging slightly north of the center line of the channel. After the course of the vessel was steadied and within five minutes after passing the dredge, the CRUMP came to a stop, grounding on a shoal or sandbank in Short Cut Turn.

Short Cut Turn is a segment of the channel forming a bend in St. Johns River, and is approximately .4 miles long. As the river turns the bend it flows generally eastward toward the Atlantic Ocean. The channel at Short Cut Turn is 480 feet wide, and for purposes of plotting navigational charts is divided vertically into four imaginary 120-foot sections designated from north to south, respectively, as "left outside," "left inside," "right inside" and "right outside" quarters. Horizontally, it is divided from east to west into Cut 17, Cut 18 and Cut 19. The District Court found that the grounding of the CRUMP occurred in the right inside quarter of the channel in Cut 18, with her port side parallel to and on the center line of the channel.

In June of 1970 the United States Corps of Engineers awarded a dredging contract for the purpose of deepening a 10.7-mile section of the St. Johns River channel from a 34-foot project mean low water depth to 38 feet, and dredging commenced shortly thereafter. Short Cut Turn, where the grounding occurred, is situated in the 10.7-mile section. In August 1971, the Corps of Engineers took sounding surveys of Short Cut Turn including the area known as Cut 18. The District Court found that the August surveys revealed that a shoaling condition was extending at that time from the south edge of the channel into approximately 30 per cent of the entire south side of the channel in Cut 18,[3] and that the Corps of Engineers failed to send the results of these surveys to the St. Johns Bar Pilots Association.[4]

The District Court summarized three acts of omission by the Corps of Engineers which it found to be the proximate cause of the grounding: failure to advise the proper persons of the known shoaling condition discovered by the August 1971 soundings; failure to resurvey the south side of Short Cut Turn; failure to dredge Short Cut Turn to eliminate the dangerous shoaling condition.

On this appeal the Government's contentions are as follows:

1. Assuming, *arguendo*, that the Government has any duty to sound and dredge the channel of a navigable waterway on a regular basis,

---

2. This was in excess of the maximum draft of 33.6 feet set by Canadian Pacific in its written instructions to Captain Roberts.

3. This finding is not substantiated by the evidence and is clearly erroneous. Thirty per cent of the south side of the channel in Cut 18 is approximately 72 feet out from the channel edge. At this distance out there is only one depth (33.5 feet) below the project depth of 34 feet shown; all other soundings exceed the project depth according to the Corps' pre-dredging survey made in the summer of 1971 and another dated August 13, 1971.

4. However, Gail Gren, Chief of Operations Division of the Corps of Engineers, recalled having sent notices about the shoaling condition to various individuals including the St. Johns River Bar Pilots Association. Clyde Aston, Chief of the Navigation Section, Corps of Engineers, testified to the same effect.

knowledge of a shoal in one location does not impute to it knowledge of a possible shoal in another location and require it thereafter to immediately dredge this location of the known shoal or to sound both that and other locations until dredged.

2. The Government is under no duty nor has it assumed a duty to sound or dredge a navigable channel at any particular time or place.

3. The grounding of the CRUMP was not caused by the Government's failure to disseminate the information contained in the August sounding surveys.

On the other hand, Canadian Pacific, as appellee, contends that the trial court's findings of fact and conclusions of law are supported by the record and the law, are not clearly erroneous, and should be affirmed.

Implicit in the District Court's finding is the existence of a legal duty or obligation owed by the Corps of Engineers to Canadian Pacific under the existing circumstances. Therefore, the extent of that duty must be explored before a determination can be made in regard to the correctness of the District Court findings.

■ The Suits in Admiralty Act, under which this complaint was filed, equates the standard of duty owed by the Government to that of a private person in like circumstances.[5] We have held this standard requires the use of due care. *De Bardeleben Marine Corp. v. United States*, 5 Cir., 1971, 451 F.2d 140, 149.

The duty of a private owner of a navigable canal in regard to obstructions was considered in *Guinan v. Boston, Cape Cod & New York Canal Co.*, 2 Cir., 1924, 1 F.2d 239, where the court held:

Inasmuch as the Canal Company is not an insurer that its canal is at all times in such condition as to render navigation thereon safe, and as it is only subjected to the duty of taking reasonable care that

those allowed to navigate it may do so without danger, the burden of proof is on libelants to show a breach of this duty.

The libelant, as pointed out, charged the Canal Company with negligence, because it permitted the canal to *remain* in a condition unsafe and unfit for the passage of vessels. But there is not the slightest support in the evidence for any of these allegations. The Canal Company certainly did not 'permit' the canal to 'remain' in an unsafe and unfit condition; for it was without knowledge up to the time of the accident that such a condition existed. . . . Whatever may have been the obstruction, it clearly was not a permanent one. No one saw it, or knew of the existence of any obstruction at that point, until the accident, and although, after the accident, careful soundings were made, no indications of any obstruction could be found. This burden of showing negligence, or want of due care, on the part of the respondent, the libelants, in our opinion, did not sustain.

1 F.2d at 244, 245.

In *De Bardeleben Marine Corp. v. United States, supra,* damages were sustained when the anchor of a barge ruptured a pipeline submerged in navigable water. We held that there was no breach of duty by the Coast Guard for the dissemination of a Notice to Mariners containing false information (it did not show the existence of the pipeline) upon which a pilot relied, where the Coast Guard published subsequent Notices showing the position of the pipeline. We found that the Government's obligation ceased at the time in which a prudent shipowner-navigator would have reasonably received the new Notices. 451 F.2d at 149.

The precise question before us, that is, the extent of the duty owed to navigators by the Corps of Engineers in regard to the existence of shoaling conditions in navigable waters, to our knowledge, has not been answered by the Supreme Court or this circuit.[6]

---

**5.** *See* n. 1, *supra; De Bardeleben Marine Corp. v. United States,* 5 Cir., 1971, 451 F.2d 140.

**6.** The parties cite no applicable authority and our independent research has uncovered none.

In *Indian Towing Company v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), relied on by Canadian Pacific, liability was imposed on the Government under the Federal Tort Claims Act, 28 U.S.C. § 1346 *et seq.*,[7] for damages sustained by a tug grounding on Chandeleur Island because of the negligent operation by the Coast Guard of a lighthouse, whose light became extinguished and was not functioning. The Court noted that "it is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner. *Id.*, 350 U.S. at 64–65, 76 S.Ct. at 124. Applying the standard of due care, the Court held:

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning.

*Id.*, 350 U.S. at 69, 76 S.Ct. at 126–127.

■ Applying the principles learned in *De Bardeleben Marine* and *Indian Towing Company, supra,* we note that in the present case, the Government had no prior knowledge of the existence of the shoal which caused the accident and therefore could not and did not mislead. Consequently, no dereliction of the obligation of due care can be found in this regard.

■ Nor was there lack of due care in the Government's failure to discover the shoal on which the CRUMP grounded. The record is replete with evidence that shoaling builds up rapidly in Short Cut Turn.[8] Captain Eldemire, the pilot of the CRUMP, testified that the St. Johns River is one of the most unpredictable rivers in the country, that even after having made approximately 600 outbound transits in the river prior to the grounding of the CRUMP, he continued to discover new and different shoaling. He had never, however, discovered any shoaling in the right inside quarter of the channel. Gail Gren, Chief of Operations Division of the Corps of Engineers, said that shoaling was inevitable and that there was no navigation project in Florida that did not have shoaling. The testimony of J. A. Begue, Party Chief of Surveys, Corps of Engineers, was to the same effect. Clyde Aston, Chief of the Navigation Section, Corps of Engineers, testified that the south side of Short Cut Turn had a history of shoaling. It is also obvious from the record that these shoals sometimes disappear as quickly as they occur. Soundings taken on December 9, 1971 by the Harbor Engineering Company at the request of the ship's agents, just three days after the grounding, show no depth below the 34-foot project at the location where the court found the CRUMP to have grounded. A fathometer survey obtained on December 28, 1971 indicates no shoaling whatsoever in the right inside quarter of Cut 18. The District Court found that a comparison of the August and December surveys taken by the Corps of Engineers clearly showed that shoal on which the CRUMP ran aground had been dredged following the incident but prior to the December survey. The evidence does not substantiate this assumption.[9] Nor does the evidence support the

---

7. The Act contains provisions similar to the Suits in Admiralty Act, imposing liability on the United States where it, "if a private person, would be liable to the claimant," 28 U.S.C. § 1346(b), and "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

8. Inasmuch as the CRUMP, with a breadth of 93 feet, went aground just south and parallel to the center line of the channel, and according to the August surveys the shallowest depth of water within 93 feet from the center line was

36.8 feet, the conclusion is obvious that the shoal on which the grounding occurred built up between August and December 1971.

9. Gren initially testified in his deposition that dredging of the area in which the CRUMP grounded began within a week after the grounding. However, he explained at trial that while the dredge was in fact in the area at that time, it was not until February that it was at that particular reach of the river, according to the Corps' layout which showed exactly when and where dredging occurred. Begue could not

inference that the Corps of Engineers had the continuing duty of resurveying and dredging whenever a shoal appeared in the river. Gail Gren testified that although the Corps is charged with maintaining existing project depths of navigable waters, it is limited to the funds allocated by Congress. There were two dredges available for deepening the 34-foot channel to 38 feet, and the job took approximately two and one-half years. Rental for a dredge the size of the BILL BAUER exceeds $12,000 a day. The dredges are not self-propelled and to move them from one area to another is time-consuming and costly. Minor shoaling would not justify the move because of the expense involved, and the Corps knew of no shoaling in the right inside quarter. Gren further testified that the Corps of Engineers conducts pre-dredge surveys, after-dredge surveys and periodic or examination surveys, but there is no set schedule for surveys at regular intervals. Clyde Aston also testified to the impracticability and costliness of diverting a dredge from its scheduled work plan. He said that the contract specified the extent of the channel to be dredged, starting near Blount Island with the work to progress eastward toward the ocean. However, the exact station and range to be cut in any one particular day was optional with the contractor. Although the Government could have directed changes in the schedule, this would have required a substantial amount of additional work, time and money. Moving a dredge requires moving all the connecting pipeline. In addition to the daily rental of the dredges, the Government would have had to pay for the mobilization and demobilization of the dredge and the relaying of pipeline. The total cost of the entire contract was in excess of $11,000,000.

Neither Gren nor Aston was aware of any necessity, under the known existing circumstances, for rescheduling or interfering with the dredging plan. Canadian Pacific neither alleged nor offered evidence of any knowledge by the Corps of Engineers

that the offending shoal existed. In short, we find no duty imposed on the Corps, or assumed by it in the present case, to survey or dredge the channel of the St. Johns River at any particular time or place. To require such a duty would in effect make the Government the guarantor or insurer of the navigability at all times of the river, despite its ever-changing bed affected by tide, currents, erosion and wave wash of vessels constantly plying its course, and the limitation on funds available to the Corps.

While each case must necessarily be decided on its own facts, language in *Kommanvittselskapet Harwi (Rolf Wigand) v. United States,* E.D.Pa., 1969, 305 F.Supp. 882, a case similar to the one under consideration, is most persuasive. In that case a suit was brought under the Suits in Admiralty Act for damages incurred by a ship when it grounded on a shoal in the channel of the Delaware River. Some of the contentions made were the same as those advanced here, *i. e.,* that the grounding was caused by the negligence of the Corps of Engineers in failing to regularly survey and dredge the channel or to publish information as to the depth of the channel. The District Court found that the Government was not liable under any theory, stating:

We are unaware of any statutory requirement that the United States Corps of Engineers or any other agency of the United States Government survey and maintain the 25′ channel in Torresdale Range at regular and frequent intervals. It is true, as the libellants point out, that Congress has the general power to regulate navigable waterways in interstate or foreign commerce. Constitution, Art. 1, Section 8, cl. 3. But this grant of power certainly is not an assumption of the duty to make all interstate waterways navigable.

305 F.Supp. at 889. The court continued:

[W]e cannot lightly presume the assumption of a duty which involves a costly course of conduct over an extended peri-

---

recall the specific date of the dredging of the grounding site, but based on the location of the dredge at that time, he was of the opinion that

it could not have occurred within a month of the grounding.

od and the undertaking of which would be tantamount to making the government the virtual insurer of navigation on the Delaware.[10]

305 F.Supp. at 890.

■ The same principle is applicable here. Canadian Pacific cites no authority, statutory or otherwise, which imposes a duty on the Corps of Engineers or any government agency to either dredge or conduct sounding surveys of navigable waters at any particular time to assure navigators that shoaling is not occurring. There is nothing in the Suits in Admiralty Act, or other statutory authority in which the Government has waived immunity to tort, which mandates such an obligation. Likewise, the evidence elicited from the Government that it is responsible for maintaining existing project depths and supervising new project construction within the funds allocated by Congress does not amount to a general undertaking by the Corps, either required or assumed, to conduct sounding or dredging activities on the St. Johns River at any given time. Canadian Pacific has failed to sustain its burden of proof in this regard. Thus the District Court's findings and conclusions of negligence based on the failure of the Government to resurvey and dredge Short Cut Turn are clearly erroneous and must be set aside. *McAllister v. United States,* 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); *Chaney v. City of Galveston,* 5 Cir., 1966, 368 F.2d 774.

■ A final basis for imposing liability on the Government was its alleged failure to advise the proper persons of the known shoaling condition discovered by the August 1971 soundings. As heretofore indicated, the evidence was in conflict in regard to whether the Government had sent copies of its August surveys to the St. Johns Bar Pilot Association.[11] The District Court resolved the conflict in favor of Canadian Pacific thereby exercising a credibility choice between two permissible views. *See Chaney v. City of Galveston, supra,* 368 F.2d at 776. Thus we cannot say that this finding is clearly erroneous. Nevertheless, the failure of the Government to send this information to the association cannot, under the present circumstances, form the basis of liability. The August surveys showed shoaling in the right outside quarter but none in the right inside quarter of the channel, the quarter in which the CRUMP grounded. There is undisputed evidence that the St. Johns Bar Pilot Association was aware of the shoaling indicated in the August surveys. One of its members, Captain Davis, called the attention of the Corps to shoaling in Short Cut Turn in February 1971. Captain Eldemire, the pilot of the CRUMP, testified that he personally was aware of shoaling in the right *outside* quarter and consequently even if he had received the August surveys that he would not have navigated the vessel differently on the day of the grounding. Thus the evidence is undisputed that nothing contained in the August survey reports would have averted the accident, and the District Court erred in finding a causal relationship between the failure of the Government to disseminate this information and the grounding.

REVERSED.

---

10. The Third Circuit affirmed *Kommanvittselskapet Harwi (R. Wigand) v. United States,* 1972, 467 F.2d 456, but found it unnecessary to decide whether the Government had a statutory duty to maintain and survey the existing range. It based its decision on the failure of the vessel owner to prove that the pilot relied on information published by the Government (conceding *arguendo* that the information was misleading) or that any such reliance could have caused the grounding.

11. *See* n. 4, *supra.*