**In re the Complaint and Petition of LLOYD'S LEASING LTD., as Owner and Cammell Laird Shipbuilders, Ltd., and Alvenus Shipping Co., Ltd., as Charterers or Owners Pro Hac Vice of the M/T ALVENUS, her Engines, Tackle, etc., in a Cause of Exoneration From or Limitation of Liability.**

Civ. A. No. G–84–293.

United States District Court,
S.D. Texas,
Galveston Division.

June 26, 1990.

Order and Amended Conclusions
of Law. Oct. 3, 1990.

See also 902 F.2d 368.

James Patrick Cooney, and John M. Elsley, Royston, Rayzor, Vickery & Williams, Constance M. Walker, Jerry W. Ashby, Wayne K. Anderson, Legal Dept., Conoco, Inc., Houston, Tex., for Conoco, Inc.

Charles R. Houssiere, Houssiere & Durant, Houston, Tex., for Earl Stark and White et al.

Ken Cross, Asst. Atty. Gen., and Ben F. McDonald, Sp. Asst. Atty. Gen., Austin, Tex., for State of Tex.

Scott Lyford, Office of County Atty., Galveston, Tex., for Galveston County, Tex. and Galveston County Beach Park Bd. of Trustees.

Dana Timaeus and George Jamail, Benckenstein, Oxford, Radford & Johnson, Beaumont, Tex., for Stephen O. Johnson, S. Johnson Marine, Jack Hemmenway and Jack's Shrimp House.

George W. Lederer, Jr., Houston, Tex., Paul W. Wommack, Ralph K. Harrison, The Woodlands, Tex., for Mitchell Devel. Corp. of the Southwest, Mitchell Realty Co., The Fort Crickett Hotel Ltd., and George P. Mitchell.

Ronald G. Woods, U.S. Atty., Houston, Tex., and R. Scott Blaze, Trial Atty., Washington, D.C., for U.S.

Beck Smith, Smith & Stowers, Galveston, Tex., for David Richard, Theo Carroll White, Charles Richard and Billy Kesel.

Lester J. Lautenschlaeger, Jr., Lautenschlaeger & Oberhelman, New Orleans, La., and Kenneth Michael Wright, Lake Charles, La., for Malcolm Gillis and Lake Charles Pilots, Inc.

Mike Gallagher, Fisher, Gallagher, Perrin & Lewis, Houston, Tex., and E.A. Apffel, W. Daniel Vaughn and J.D. Bashline, Galveston, Tex., for several other claimants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HUGH GIBSON, District Judge.

*Findings of Fact*

### I. Introduction

This is a complex limitation of liability proceeding arising from the massive structural failure that the M/T ALVENUS experienced in making her transit up the Calcasieu Channel, off the Louisiana coast. As a consequence of her structural failure, the M/T ALVENUS spilled approximately 66,000 barrels of crude oil into the Gulf of Mexico. The oil washed ashore approximately 70 miles away onto Texas shores, including the beaches of Galveston Island.

This action was commenced when the owner and the bareboat charterers of the ALVENUS, Lloyd's Leasing, Ltd.; Cammell Laird Shipbuilders, Ltd.; and Alvenus Shipping Co., Ltd., filed a petition seeking exoneration from or limitation of liability. A large number of claimants came forward, seeking recovery from the petitioners. The claimants additionally seek recovery from Conoco, the vessel's voyage charterer; the United States Army Corps of Engineers, the agency responsible for the construction, maintenance, and monitoring of the Channel; the Lake Charles Pilots Association; Captain Malcolm Gillis, the pilot at the conn of the vessel at the time of the incident; Captain Rudyard Shipley, the Master of the ALVENUS; Silver Line Ltd., Captain Shipley's direct employer; and Silver Navigation Ltd.

In addition to the contribution and indemnity for claimants' claims, the petitioners are seeking to recover from Conoco and the United States damages that the ALVENUS sustained, including oil pollution clean-up expenses, vessel repair expenses, and loss of use. Conoco is asserting a claim against the petitioners seeking to recover for its cargo loss and its contribution to general average. The United States seeks recovery from the petitioners under the Federal Water Pollution Control Act for the expenses incurred in cleaning up the spill.

The Court bifurcated the trial, ordering the parties to present the limitation and liability issues separately from the damages issues. The parties tried their case on the limitation and liability issues to the Court from September 5, 1989, to November 8, 1989. Having considered the evidence and arguments presented, the Court enters the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

### II. The Voyage and the Casualty

#### A. The Voyage

1. Conoco, Inc. executed a voyage charter with Alvenus Shipping Co., Ltd., dated July 16, 1984, for the M/T ALVENUS to

carry a load of crude oil. The voyage instructions indicated that the carriage would be from Venezuela to Conoco's Clifton Ridge Terminal near Lake Charles, Louisiana. The ALVENUS loaded crude at Caripito on July 20 and 21, 1984, and at Puerto La Cruz on July 23, 1984.

2. On the morning of July 30, 1984, the ALVENUS arrived at the entrance to the Calcasieu Bar Channel, off the Louisiana coast in the vicinity of Lake Charles. Conoco had instructed the vessel to load the maximum cargo consistent with a 40–foot fresh water arrival draft. Actual mean draft of the vessel on arrival at the channel entrance was approximately 39 feet, 3 inches. On arrival in the fresh water at the terminal, this would have been a draft of approximately 40 feet, 3 inches. At the casualty site, the Chief Mate calculated the draft to be 39 feet, 9 inches at the bow and 39 feet, 7 inches at the stern. Therefore, the ALVENUS was trimmed about 2–3 inches down by the bow, increasing the draft at the bow, relative to the stern.

3. Malcolm Gillis, a Lake Charles pilot since 1978, and president of Lake Charles Pilots, Inc., boarded the vessel at the entrance to the channel.

4. The pilot, Captain Gillis, and the Master of the ALVENUS, Captain Rudyard Shipley, discussed several points about the inbound voyage: the draft of the ship, the depth and available water in the channel, and the speed to be used.

5. The ship proceeded inbound generally in the center of the channel. The speed selected for the ALVENUS was the full maneuvering speed, approximately 11 knots. The speed of the vessel, selected by the Master of the ALVENUS, was a usual and customary speed for similar vessels transiting the Calcasieu Channel. The handling was considered normal. The weather was clear with a slight sea and a wind of around 15 to 20 knots out of the east. The pilot believed tidal conditions were favorable, with a 2–½–foot tide, and there were no conditions which required special precautions for a ship with a 40–foot fresh water draft. The ALVENUS transit up the

channel was essentially identical to that of other deep draft tankers.

### B. Failure of the ALVENUS

6. The ALVENUS was in the vicinity of Buoys 19 and 20, and apparently in the center of the channel, when she suffered a structural failure. Captain Shipley had no sensation of hitting anything at any time. Captain Shipley did have a feeling of deceleration immediately preceding the time of the failure. There was no jolt or perceived impact prior to the failure. There was no sound prior to the failure. To Captain Shipley's knowledge, the vessel had not grounded prior to the failure. Similarly, the Chief Officer and Second Officer had no sensation that the ALVENUS grounded. The pilot, Captain Gillis, did not sense any slowing before the failure.

7. Oil sprayed up from the deck in the center of the vessel's No. 2 tanks, followed very rapidly by the violent upward lifting of the vessel's bow. As the hull was buckling, the engines of the ALVENUS were stopped and the ship decelerated. The ship drifted slowly out of the dredged channel to the northwest, eventually grounding about two miles northwest of the scene of the casualty, and three-quarters of a mile outside the channel.

8. Approximately 66,000 barrels of crude oil were spilled from the ship into the Gulf of Mexico. Given the particular combination of tides and waves that existed at the time of the spill, the oil washed ashore on a 40–mile stretch of beach in Texas, which included Galveston Island, approximately 70 miles west of the ALVENUS site.

9. The remaining cargo was successfully discharged into barges and delivered to its destination. The ship was subsequently towed to Galveston for temporary repairs, and thereafter permanently repaired in Sweden.

### III. History and Usage of the Calcasieu Channel

#### A. Dredging and Maintenance

10. The United States Army Corps of Engineers conducted new-work dredging in

the Calcasieu Channel between 1963 and 1968. This dredging was to achieve an authorized depth of –42 feet mean low Gulf (MLG). The channel was actually dredged several feet deeper, to account for the nature of the dredging process and to assure that a minimum –42 feet MLG was achieved. In the area of the casualty, the new-work dredging was to a depth in excess of –44 feet MLG. The Channel in the relevant area was generally a shallow dish, five to six feet deeper than the surrounding area, and 800 feet wide.

11. Some material subsequently reentered the Channel, the amount and rate of silting being greater in the Inner Bar, or "first tangent." This is generally referred to as the area north of buoys 27–28, or as the area down to statute "mile minus 10," or 10 miles south of the jetties, which is a little south of buoys 27–28, and about three miles north of the area of the ALVENUS casualty. Periodic maintenance dredging was required, particularly in the Inner Bar, but any lesser depth found in the relevant area around buoys 19–20 on surveys subsequent to the initial construction was soft silt, or silt-like material, which tended to shift about under the effect of passing vessels, storms, and other phenomena.

12. A fathometer survey of the Channel by the Corps in April 1984, prior to the casualty, and several fathometer and magnetometer surveys immediately after the casualty, did not reveal any unusual condition in the Channel.

13. The pilots had not noted any unusual behavior of ships that would indicate abnormal conditions in the Channel in the area of the casualty. The pilots had noticed soft silting and the presence of suspended silt (fluff) in areas of the Channel some distance from the casualty site.

14. When the Corps of Engineers dredged the area of the casualty subsequent to the casualty, it found no unusual conditions, nor did it remove any hard material.

15. The project depth for the Bar Channel, until Congress alters it, was and is –42 feet MLG. The controlling depth changes. At the time of the casualty, the controlling depth had been reported in a hydrographic bulletin to the maritime public as being –37 feet MLG in the Bar Channel. The report was issued through Hydrographic Bulletin No. 1, dated January 26, 1984. As a general practice, the Corps reported a single controlling depth for the entire Bar Channel. This was both the established practice of the Corps, and the practice in this particular instance of the January 26, 1984 Hydrographic Bulletin.

*B. Geology of Channel Bottom*

16. E. Burton Kemp, III, a professional geologist, appearing as an expert for the United States, testified about the geological nature of the formations found in the general area of Calcasieu Bar Channel, and about the nature of the material found in the area of the casualty during a 1987 investigation Mr. Kemp and others conducted.

17. Mr. Kemp performed an investigation in the general vicinity of buoys 19 and 20 during 1987. This involved taking subsoil borings both in and out of the Channel, classifying the samples, and identifying the depth at which he found the samples. The classifications include color, type of material, and consistency. From this, Kemp plotted the pleistocene horizon in the area. The horizon is the elevation at which virgin pleistocene material existed.

18. Pleistocene is a desiccated, overconsolidated material that is found at varying elevations in the area of the Bar Channel. However, no pleistocene was within the project limits of the Channel above –42 feet MLG. The shallowest location of pleistocene in the Channel was on the far eastern side of the Channel, approximately 100 feet from the channel edge, at an elevation of –44.22 feet MLG. In the western half of the Channel, where the petitioners claim the casualty occurred, the shallowest elevation at which Mr. Kemp found pleistocene was –46.22 feet MLG. The Court accepts Mr. Kemp's findings that no undredged virgin material above project depth existed at the time of his investigations. The Court further finds, based on all of the evidence, that no undredged virgin material

existed after the new-work dredging was completed.

19. The Court finds that there were no outcroppings of pleistocene or hard material within the Channel in the casualty location, in the sense that such "outcroppings" were above the surrounding elevation of the channel bottom. The bottom is relatively flat, both in the dredged and undredged area.

20. As one proceeds south from Lake Charles, the level of pleistocene dips naturally and substantially—approximately two feet per mile. Accordingly, simply because pleistocene may be found, for example, at –37 feet MLG 10,000 feet south of the shore is no indication that pleistocene would also be found at that elevation 60,000 feet south of the shore. Consequently, the Bean dispute does not constitute notice to the Corps of a problem at the casualty site.

21. The natural tendency in the area of the casualty is that the pleistocene horizon becomes deeper as one travels west in the Channel. Accordingly, in the area of the Channel where petitioners allege the casualty occurred, i.e., the west, the pleistocene horizon was considerably deeper than in the far eastern reaches of the Channel.

22. Although there were instances where Mr. Kemp found medium to stiff to very stiff material at or near the surface of the bottom, these materials were at elevations considerably deeper than –42 feet MLG. In most cases, these materials were found outside the dredged channel.

23. There is not necessarily a direct relationship between density of a material and sheer strength or bearing capacity. Numerous other factors affect the density of materials that have no corresponding effect on the sheer strength or bearing capacity.

24. The General Design Memorandum (GDM) contains no evidence of borings in the area of the casualty, and therefore provides no evidence of pleistocene or any other material at any particular elevation in that area. The borings contained in the GDM relate to an area considerably north of the casualty that the ALVENUS never reached.

25. No undredged virgin material of any sort existed within the project limits of the Bar Channel at the casualty site. The Corps had no notice of any such material in the casualty site. No liability can attach to the Corps for failure to warn of an obstruction that did not exist, and therefore of which the Corps had no knowledge.

*C. Channel Buoys*

26. The Calcasieu Bar Channel is buoyed by the United States Coast Guard. Buoys are positioned on either side of the Channel from the sea buoy at Mile –23.57 landward. The buoys are numbered, with numbers increasing proceeding northward. The casualty occurred as the ALVENUS passed through buoy pair 19/20, with buoy 19 to the west and buoy 20 to the east.

27. The buoys in the relevant area were properly positioned.

*D. Vessel Traffic*
 1. History of Usage

28. The practice of bringing ships into the Channel at a draft of 40 feet in fresh water, equivalent to about 39 feet in salt water, goes back to at least 1981, and continues to the present day. Records that the Lake Charles Pilots keep show that from January 1, 1983, through August 21, 1984, which was the completion date of the maintenance dredging begun after the ALVENUS casualty, 107 ships were brought in or out of the Calcasieu Channel with drafts of 39 feet in fresh water, or greater. Fifty-nine of these ships had drafts greater than 39 feet, 6 inches fresh water and 5 had drafts of over 40 feet fresh water. Other Lake Charles Pilots records, showing only inbound ships and covering a longer time period, showed successful transits for several hundred ships with drafts of 38 feet or greater. It is common practice in the United States Gulf of Mexico to utilize a 40–foot draft, and it is common practice in the United States Gulf and other similar ports to enter a port with a draft close to the bottom.

29. Variations in water level mean that different drafts may, in fact, produce identical or similar under keel clearances. "Under keel clearance" is the distance between the bottom of the ship and the bottom of the Channel.

30. The pilots had informed port users, including Conoco, that ships of a draft of up to 40 feet fresh water would be accepted for transit in the Channel under ordinary circumstances. They recently had reiterated this information by a June 1984 letter.

31. There were occasional temporary variations in acceptable drafts when observation of the behavior of the ships indicated silting in the Inner Bar Channel, when water levels varied because of meteorological conditions, when there was local silting at one of the terminals in the river, or when other transient factors made temporary changes advisable. At the time of the ALVENUS transit, 40 feet fresh water was the draft the pilots were accepting for transit. Less than three weeks before the ALVENUS broke, a vessel under charter to Conoco had entered the Channel, with a draft in excess of 40 feet, with no complaints of difficulty.

32. Conoco and other users, including the ALVENUS, consulted with and relied upon information from the Lake Charles Pilots for knowledge of conditions in the Channel.

33. Conoco had no reason to believe or expect that, under normal circumstances, a vessel with a 40-foot fresh water draft would contact the bottom, contact anything hard, or be damaged in any way.

### 2. Damage to Vessels

34. The ALVENUS is the only vessel ever known to have suffered hull damage while transiting the Calcasieu Channel.

35. None of at least 7 other vessels, which actually ran aground, or noticeably came in contact with the bottom, in or near the Calcasieu Channel prior to the ALVENUS casualty, reported sustaining any vessel damage. These contacts with the bottom did not give Pilot Gillis any concerns about the safety of the Channel. Captain Valdes,

Conoco's Director of Marine Traffic, did not believe these incidents called for a change in draft. Even the ALVENUS' owners' chartering manager conceded that only one incident, in 1982, caused him any concern about a 40-foot draft. The absence of damage and danger is consistent with touchings or groundings in similar river ports, in the United States Gulf, and worldwide.

36. The damage to the ALVENUS was not foreseeable by Conoco, the pilots, or others as a possible consequence of a seaworthy vessel touching bottom or grounding in the Calcasieu Channel.

### IV. Control of and Responsibility for the ALVENUS' Operation

37. In the marine industry, the Master of the ship has the ultimate responsibility for the safety, navigation, and handling of the ship.

38. The pilots have the most up-to-date knowledge of channel conditions. The pilot's information, for the day the transit is made, is the best information on conditions.

39. Conoco, as a terminal operator, is responsible for knowing and maintaining the conditions at and around its terminal. Conoco reasonably relied on the pilots for information on the overall channel conditions. Captain Valdes had the responsibility for the voyage instructions given to the ALVENUS with respect to draft.

40. By custom in the marine industry, and according to the ALVENUS' owners' Operations Manual, the responsibility for the ship remains with the Master while the pilot is on board. The Master uses all available information and, then, using his own personal judgment and experience, decides whether and how to proceed.

41. Conoco, as the voyage charterer, had no control over the speed or the maneuvering of the ALVENUS while it was proceeding through the Channel.

42. The voyage instructions were provided by Conoco through brokers to Navcot, the ALVENUS' owners' chartering manager in New York, and included the specific load and discharge ports, the

amount of cargo to be loaded, and the maximum draft for arrival in fresh water in Lake Charles. This information was not included in the Charter Party. The owners' office passed the voyage instructions to Captain Shipley. He assumed that his owners' office accepted the draft stipulated by Conoco, and believed it safe.

43. Captain Shipley determined that it was impossible to load the amount of cargo requested and comply with the 40–foot draft, so the amount of cargo was reduced. Captain Shipley did not request to reduce the draft to less than 40 feet.

44. Captain Shipley should bear no responsibility in the ship casualty and oil spill incident of July 30, 1984.

45. First, at the time of the incident, the ALVENUS was traveling at a safe and customary speed. At the time of the incident, the vessel was not experiencing excessive vibration or problems with maneuverability, both indicators of excessive speed.

46. Captain Shipley was not at fault for not undertaking a specific squat calculation. On taking Gillis aboard as a pilot, Shipley was informed that the Channel had a minimum depth of 40 feet, plus 2 feet over-cut, and the height of tide was approximately 2.5 feet. Under these conditions, Captain Shipley calculated that he had 4.5 feet-minimum under keel clearance in fresh water, and something approaching 5–½ feet-under keel clearance in salt water. Previously, in making shallow water passages, Captain Shipley had utilized a rule-of-thumb of a minimum of 10% of the ship's draft as an acceptable under keel clearance. With a 39.2 foot salt water draft, Captain Shipley had clearance well in excess of his 10% rule-of-thumb. Simple calculations reflect that he had over 13% under keel clearance based upon the information Captain Gillis provided. The 10% rule-of-thumb that Captain Shipley utilized is a common and accepted guideline that masters utilize worldwide to take into account vessel squat in shallow water transits.

47. The Court finds that the passage planning that Captain Shipley undertook was customary and adequate. Upon receiving Voyage Instructions from Conoco, Shipley passed the instructions to all officers concerned, including the deck officers and navigating officer. The navigating officer prepared for the voyage by referring to the necessary charts, tide tables, and pilot books and laid out appropriate courses for the voyage. Upon reaching the Sea Buoy off Cameron, Captain Shipley consulted with Pilot Gillis regarding the available depth of water. Such acts reflect proper and customary passage planning.

48. The Court finds that the pilot/master exchange between Captain Gillis and Captain Shipley relative to the subject of water depths and under keel clearance was reasonable and customary.

49. Although Captain Shipley was present on the bridge from the time the ALVENUS entered the safety fairway, to shortly before the grounding, he departed the bridge momentarily to retrieve a ship's bunker book, with the intention of returning to the bridge promptly. The Court does not fault Captain Shipley in this regard. A master's presence on the bridge is not imperative in pilotage waters, nor is his presence required by any known regulation. Up to the time of the grounding and oil spill incident, the passage was routine, and there was no objective indication of danger that would have required Captain Shipley to remain on the bridge to countermand the pilot's orders. At all times, Captain Shipley was awake and only seconds away, if needed. At the time Captain Shipley absented himself from the bridge, Second Officer Telford was on the bridge standing his normal watch as the vessel's navigating officer.

50. The fathometer onboard the M/T ALVENUS was not in use in the shallow water transit up the Channel. The Court finds that Captain Shipley was not negligent in securing the fathometer when it began providing unreliable information about water depths in the Channel. Fathometers are not customarily used in shallow water transits because they tend to provide erratic information.

51. The Court finds that the operators of the M/T ALVENUS were not negligent for failing to provide squat charts for the vessel. Squat charts, on occasion, are found on large size vessels such as VLCC's and large bulk carriers, but it was not industry practice in 1984 to have squat charts placed on the smaller Panamax-sized tanker such as the ALVENUS. Ship owners/operators are entitled to expect their masters to be aware of the phenomenon of squat and, where appropriate, make allowance in the planning of the navigation passage for such phenomenon. In this case, Captain Shipley made such allowance by virtue of the application of his minimum 10% rule-of-thumb.

52. The M/T ALVENUS had onboard British Admiralty Chart 975 and United States (NOAA) Chart No. 11347 available for the vessel's use for transit up the Channel. British Admiralty Chart 975 was updated from the latest British Notice to Mariners. The NOAA chart aboard the AL-VENUS was not corrected to the latest United States Notice to Mariners. A foreign flag vessel, however, is entitled to have the foreign equivalent of NOAA charts and corrections for Notice to Mariners onboard, in lieu of the American counterpart. The Notice to Mariners which was lacking on the NOAA chart in fact only corrected the controlling depth information from 34 feet MLG to 37 feet MLG. Accordingly, the Court finds that, even if NOAA chart had been corrected, it would have shown more water depth in the Calcasieu Channel than did the NOAA chart in its uncorrected state. Accordingly, the failure to have the NOAA chart corrected could not have been a contributing cause of the July 30, 1984, casualty.

53. The policy that the operators of the ALVENUS followed was to make under keel clearance a matter of the master's judgment and discretion, so that he could make decisions after consideration of all relevant factors, including sea state, weather, and tide. The Court finds that the failure to have a declared policy of minimal under keel clearance could not have been a contributing cause of the July 30, 1984, incident.

54. The M/T ALVENUS had onboard a general operations manual running to almost 300 pages in length and a standing instructions manual 50 pages in length. The vessel also had onboard "M" Notices, issued by the British Government, which supplemented the general operations manual and standing instructions manual. The "M" Notices dealt with specific issues such as squat and passage planning. The Court finds that the general operations manual, the standing instructions manual, and the "M" Notices adequately dealt with subjects such as squat, passage planning, speed, and under keel clearance.

55. Captain Shipley obtained his master's license in 1962 and was promoted to master in 1965. He had been sailing as a master for approximately 19 years prior to the ALVENUS incident. He had served on a variety of vessels, mainly in the tanker trade. They varied from 18,000–ton deadweight tankers to 220,000–ton deadweight tankers, commonly referred to as VLCC's. Captain Shipley had considerable experience in the worldwide tanker trade and had substantial experience in making shallow water passages. During his period of sea service, he followed the practice of furthering his education informally by keeping current with various nautical publications and attending various refresher courses. He had all training, including refresher courses, required by British law. Accordingly, this Court finds that Captain Shipley was well qualified to serve as a master onboard the M/T ALVENUS on July 30, 1984.

56. The practice of the ALVENUS management was to subject each officer, upon being employed, to a six-month probationary period in which he was subject to critical review. Following this special probationary period, an officer was reviewed every time he left a particular vessel. The Court finds that the ALVENUS petitioners were not negligent in monitoring the performance of their master/officers.

V. The ALVENUS

*A. General Description of the Damage*

57. When inspected afloat and in dry dock after the casualty, the hull of the

ALVENUS can best be described as being upwards about 4°, in the vicinity of Frame 183, which is in the way of the No. 2 centerline and port and starboard wing cargo tanks. The deck was folded back over itself to the extent of about six feet, the plating forming a ridge with the deck forward of the damaged area about three feet higher than the deck aft of it. The fold in the deck plating was notably smooth and rounded over the port wing tank, but more distorted and torn over the centerline and starboard tanks. The ridge ran nearly straight across the deck. The aft side was at, or just forward of, the transverse weld in the deck at Frame 181.

58. The side plating was buckled and crumpled with considerable tearing, through which the oil in the No. 2 tanks had escaped. The buckle ran down more or less vertically to a point about 25 feet below the edge of the deck, and then turned aft at about a 45° angle. The buckling decreased as it approached the bottom of the ship, until at the keel and bottom plating there was no buckling, but only a very slight upward bend. The plating in the bottom and in the lowest part of the sides was intact. There was no structural damage to the plating of the forefoot of the bulbous bow, or the internal structure in that area, or to any other plating on the bottom. There was some abrasion, to the extent of paint rubbed off in high spots in a fore and aft direction, on the exterior of the flat bottom, and there was clay smeared on parts of the bottom. It is impossible to know exactly when this clay became attached, or whether this scraping occurred before, during, or after the collapse of the ALVENUS.

59. The interior structural members were heavily buckled in the way of the buckled plating already described. Examination of the internal stiffening in the No. 2 tanks revealed that many deck longitudinals, especially in the port wing tank, had detached from the deck, leaving large amounts of fillet welding apparently intact, without evidence of gross deformation and tearing normally to be expected in such a failure. The damage to the bottom was almost imperceptible, the vertical keel showing only slight buckling. The longitudinal bulkheads between the two No. 2 wing tanks and the No. 2 centerline tank showed buckling and tearing similar to that present on the sides. There was some very slight buckling of the bulkheads in the No. 1 and No. 3 tanks.

60. The deck piping and the structure of the deck catwalk in the way of the buckle were also damaged.

## B. Design of the ALVENUS

61. On July 30, 1984, the ALVENUS was in compliance with all applicable rules and regulations of Lloyd's Register of Shipping (LRS) necessary to maintain its class certification and therefore was "in class" at the time of the incident. It had undergone a dry docking and special survey as routinely required by Lloyd's Register of Shipping in December, 1983—January, 1984.

62. The ALVENUS was designed to meet the 1973 version of the rules promulgated by the LRS. The LRS approved the ALVENUS design and the ship was built with LRS surveyors in attendance at the shipyard to assure that the applicable LRS standards were followed in the construction process. The vessel received the classification + 100A1 "Oil Tanker: (C.C.)" with the Maltese Cross notation to indicate the presence of the LRS surveyor during construction.

63. The LRS classification of the ALVENUS constituted certification, based on the society's experience, that, as designed and built, the ALVENUS was reasonably fit to safely carry out its intended purpose of transporting petroleum cargoes and confront the perils of the sea.

64. The ALVENUS was designed by the Cammell Laird Shipbuilders' (CLS) ship design office, which produced all of the preliminary scantling plans and obtained the approval of Lloyd's Register. The ALVENUS was the fifth of five STAT–55 class ships that CLS built. The STAT–55 design was completed and approval obtained before the first of the five ships was built.

65. The primary objective of the STAT-55 was to carry crude oil or crude oil products in packages that were attractive to prospective owners. The structural design objective was to make the ship seaworthy and able to carry cargoes in a safe manner and to obtain Lloyd's classification approval. Other design considerations were to design the ship in accordance with good engineering practices to make it sufficiently safe and strong and cost effective to build and maintain. The ship was designed with a structural strength to carry the stresses its intended service induced. Because the STAT-55 was a very conventional tanker, very conventional solutions to design problems could be adopted and Lloyd's Register Classification Rules played a major part in the achievement of design objectives.

66. The profile and deck plan for the STAT-55's were submitted to Lloyd's for review after CLS prepared them. The scantlings submitted to Lloyd's were calculated by CLS to comply with Lloyd's requirements as CLS interpreted them. During the review process, the Lloyd's surveyor revised some of the scantlings that CLS submitted. The revisions of the deck plate scantlings are as follows:

| Circled No. on Plan | Plating Location | CLS | Lloyd's |
|---|---|---|---|
| 1/5 | Midship 0.4L | 20.5 mm | 19.0 mm |
| 2/6 | 165 to 181 | 19.0 mm | 17.5 mm |
| 3/7 | 181 to 197 | 15.2 mm | 14.5 mm |
| 4/8 | 197 to 213 | 11.6 mm | 13.0 mm |

In revising the scantlings for the deck plating, Lloyd's reduced the scantlings in three sections, but increased the scantlings in another. This was consistent with the revisions that Lloyd's carried out on the proposed side shell plating thickness and bulkhead thicknesses where thicknesses were both reduced and increased. This process of revising the scantlings presented was a normal part of the drawing review process.

67. The calculations required by the Lloyd's 1973 Rules to determine deck plating thickness in the midship region consisted of two separate calculations: a midship section modulus calculation and a deck panel buckling calculation. The deck plating thickness that Lloyd's would approve would be the greater thickness of the two thicknesses the calculations provided. On the STAT-55 class ships, the midships "design" deck plating thickness that Lloyd's approved was 20 mm. Lloyd's permitted a 5 percent deduction in thickness because the owner installed an approved corrosion control system; therefore, the "as built" thickness was 19 mm. The approved "design" thickness for the midship section of 20 mm was based on the section modulus calculation, rather than the deck panel buckling calculation.

68. While the 1973 Lloyd's Rules contained no factor of safety requirement against critical buckling stress of a deck panel, the "Lloyd's Register Plan Approval System for Ships, Ship-Type Procedural Document for Oil Tankers," an internal Lloyd's document, calls for a design factor of safety of a deck panel in the midship region against critical buckling stress of 1.2 mm based on the "design" thickness.

69. Under the present-day Lloyd's Rules, the total allowable stress in the AL-VENUS midship region would be 164 $N/mm^2$. This would include the maximum allowable still water bending moment under the Rules plus the stresses from the present day Rule wave. Thus, using 164 $N/mm^2$ maximum allowable stress, the design factor of safety against critical buckling stress for the midship deck panel for the STAT-55, as designed, of 20 mm "design" thickness would be 1.22. These calculations were made using an assumed yield strength of steel of 245 $N/mm^2$. The results of testing of samples of plate taken from the deck of the ALVENUS in the area

of the casualty showed that the steel had a yield strength ranging between 244 N/mm$^2$ to 321 N/mm$^2$. Therefore, the factor of safety against critical buckling calculated using a yield strength of 245 N/mm$^2$ was very conservative.

70. The plating thickness in the forward-most 10% of the deck is calculated in accordance with Lloyd's Rules and then the plating thickness between that point and the 0.4L point is determined by Lloyd's taper rule. The actual tapering is done in steps because tapered plate is not available. Using a series of plates to accomplish the taper, the designer attempts to have the taper line go through the midpoint of each adjoining plate.

71. The deck thicknesses between 0.4L and 0.1L on the STAT–55's were derived by applying Lloyd's taper rule to the midship plating thickness which was established on the basis of section modulus considerations and the O.1L thickness as determined according to the Rules. If only buckling were being considered, a new taper line could be established for comparison purposes using the midship plating thickness determined only on the basis of buckling strength. This taper line would go from 16.26 mm thickness at 0.4L to the end thickness at 0.1L. Using the taper line based on the deck panel buckling calculation, the critical buckling stress for the minimum allowable plating at Frame 183 would be 149.35 N/mm$^2$. This would be the Rule-required buckling strength at Frame 183, the location of the damage to the ALVENUS. The fitted panel in this area was 14.5 mm thick and it had a buckling strength of 158.5 N/mm$^2$. The fitted plate is therefore 6.2 percent stronger than the Rule requirement as far as buckling strength is concerned. The total design stress at Frame 183, including allowable still water bending plus wave stresses, is 115.8 N/mm$^2$. Dividing this into the critical buckling stress of the fitted deck panel of 158.5 N/mm$^2$ results in a factor of safety against buckling of 1.37, which is well above the 1.2 factor of safety required internally by Lloyd's.

72. The strength of the ALVENUS deck plating compared to Lloyd's Rule requirements is summarized thus:

### Comparison of ALVENUS Buckling Strength with Lloyd's 1973 Rule Requirements

| | Mid-ships Region | At Frame 183 |
|---|---|---|
| 1. Rule-envisioned critical buckling stress, N/mm$^2$ | 183.1 | 149.3 |
| 2. ALVENUS panel critical buckling stress, N/mm$^2$ | 194.8 | 158.5 |
| 3. Maximum still water bending stress, N/mm$^2$. 1973 Rules | 69.4 | 62.3 |
| 4. Rule factor of Safety Row 1/Row 3 | 2.637 | 2.396 |
| 5. ALVENUS factor of Safety Row 2/Row 3 | 2.806 | 2.544 |
| 6. ALVENUS percent margin over Rules | 6.4% | 6.2% |

73. The Court finds that the ALVENUS deck plating at both midships and at Frame 183 provided a buckling strength and factor of safety well above that required by the 1973 Lloyd's Rules to which she was designed.

74. At the time of this incident, the ALVENUS had been operated for about five years. Some minor corrosion and pitting was noted to have taken place in the deck plate in the area of the damage. However, the corrosion and pitting was of the degree that could reasonably be antici-

pated in a tanker of the ALVENUS' age and class and did not constitute a condition that would render the ALVENUS unfit or unseaworthy and did not contribute to the incident in any way.

## C. Construction of the ALVENUS

75. The deck area involved in the collapse and buckling of the ALVENUS was made up of stiffened panels. The stiffeners were of the bulb type, 400 millimeters in depth and 14 millimeters in thickness of web. They were affixed to the deck plate at 950–millimeter intervals by double continuous fillet welds.

76. Fillet welds are the 90° (right angle) connections between the longitudinal stiffeners and the deck plate. Their purpose is to hold the deck plate in place and to transmit the forces between the deck plate and stiffeners during a ship's seagoing life.

77. The deck unit for the No. 2 center tank was fabricated on an automated panel line. The stiffeners were fillet welded to the deck panel using a submerged arc automatic welding process.

78. The deck units for the No. 2 wing tanks port and starboard included the area of the deck where the sheer of the bow met the cambered main deck and could not be produced on the automated panel line because the units were not flat. Those panels with bends or curvatures had to be constructed in assembly bays using non-automated welding procedures. The panel at issue was constructed in the No. 3 assembly bay at Cammell Laird. The stiffeners had to be welded onto the deck plate by a manual, rather than automatic, process because the panel was constructed off the panel line.

79. The fillet welds connecting the stiffeners to the deck plate and the panel at issue were produced by a manual welding process utilizing an iron powder electrode. Cammell Laird followed the practice of utilizing Ferolux 170 and 7024 brand iron powder electrodes, both of which are Lloyd's approved electrodes. Both electrodes are over matching electrodes for Grade A steel, the steel used to fabricate the ALVENUS. Cammell Laird had uti-

lized iron powder electrodes as far back as 1963.

80. In the United States and other countries, it is an accepted welding practice to qualify welding procedures prior to the construction of a structure. The weld qualification process is a simulation of the proposed welding, done prior to construction, with the use of the actual materials under conditions like those to be used in the actual construction. Through careful examination and laboratory testing of the simulated welded materials, including destructive testing, welding personnel are able to determine whether the proposed welding conditions will produce the type of welds intended. It is particularly important with fillet welding to obtain a qualified procedure because as a practical matter certain types of laboratory testing, such as radiography, cannot be done to test for internal defects. Therefore, a procedure for fillet welding must be qualified in order to guard against shallow penetration.

81. The weld qualification Cammell Laird produced for the fillet weld connections of the deck plate and stiffeners on the ALVENUS is the automatic multi-wire welding procedure for the panel line welding. This Cammell Laird welding procedure sets forth various parameters for welding on the panel line and includes three polished and etched cross-sections of the preconstruction fillet weld samples. The procedure embodies the spirit of the fillet welds the builder intended for the ALVENUS and her sister ships.

82. While Cammell Laird did receive approval from Lloyd's for its automatic multi-wire welding procedure, the company apparently never destructively tested any of its manual iron powder electrode welds in order to determine if they were being made properly. The methods of inspection and process control in use at Cammell Laird at the time of the construction of the ALVENUS made possible the production, without detection, of significant quantities of fillet welding of inferior quality, such as that involved in the failure. Visual approval by the Lloyd's surveyor and owners' representative was relied on as the only accept-

ance standard, and no checks were made to ensure that the processes were under control and producing acceptable welds free from harmful defects. This state of construction existed despite the information available and known to Cammell Laird personnel, including information regarding the "state of the art" in merchant shipbuilding in other yards in the United Kingdom at the time. The nature of the structural failure indicates that the substandard welds made a significant contribution to the failure of the deck plating and associated stiffeners.

83. The fillet welds over the port wing tanks of the ALVENUS were deficient and cause of the casualty.

84. The post-casualty welding examinations revealed that the characteristics of the welds over the center tanks were quite different from those over the wing tanks. The port and starboard wing tank welds lacked sufficient metallurgical bonding of the base and weld metals to form proper fillet welds. These welds exhibited lack of fusion, penetration, and strength.

85. In order to achieve a proper metallurgical bond of the base and weld metals, it is imperative to have proper weld geometry, fusion, and penetration.

86. The center tank fillet welds were significantly stronger than those found over the wing tanks because they had adequate penetration and fusion. These welds also conformed to the 1974 weld qualification procedure Cammell Laird produced for Lloyd's approval.

87. By contrast, the fillet welds over the port and starboard tanks in the area of the failure were grossly deficient and defective. These failed fillet welds were of poor quality and poor workmanship.

88. There was a predominance of pull-out fractures of the fillet welds over the port side No. 2 tanks. Likewise, more than 99 percent of the fillet welds that failed over the port side were pull-out fractures and not toe fractures.

89. The port welds along stiffeners 8 through 12, which encompass a 15– by 6– feet area, did not hold due to the poor metallurgical bond between the stiffeners, deck plate, and weld metal. However, the deeper penetrating panel line welds over the center tanks "put up a fight" and the weld fractures were through the weld metal.

90. The failed port wing tank welds exhibited extremely shallow penetration, as well as lack of fusion between the weld metal and base metals.

91. The shallow penetrating welds on the port side of the ALVENUS contributed to the casualty.

92. The structural failure that the ALVENUS experienced and the actual damage to the structural members of the vessel strongly indicate that the welds between the stiffeners and deck plating at the location of the deck failure, frame 183, failed because they were faulty. No other failure mode explains the resulting physical characteristics of the vessel after failure, i.e., the way the deck rolled up. The result of the welds failing was that the ship lost all resistance to total collapse through compressive buckling.

93. Buckling failures on merchant ships are uncommon. In normal buckling of stiffened structures, there is a checkerboard pattern where one rectangle that is embraced by stiffeners goes down and the adjacent one goes up and the next one goes down. Rather than this classic mode of buckling failure, the ALVENUS' buckle was a smooth roll or folding over of the deck plate.

94. It was impossible for the "S" curve in the port side plating to have occurred unless the longitudinal stiffeners had become detached at an early stage in the failure.

VI. Petitioners' Theories of the Casualty

95. The Court finds that the theories of the vessel's failure that the petitioners' experts put forth are invalid because they are inconsistent with the facts. The experts' theories involved forces on the ship caused by contact with the bottom that would have resulted in damage to the bottom plating of the ship and would have been felt by those

on board, neither of which occurred. Their theories also involved the bow of the ALVENUS following a specific path or slope, with no significant force until a sufficiently large portion of the bottom plating was in contact with the channel bottom. This is physically impossible because the required paths to produce the required forces resulted in only a point contact. Finally, the theories required some sort of action from the mud or clay at the bottom of the channel that was impossible without assuming a rise in the bottom of such a size that there was less than a 0.5% probability that all other ships had missed it, and that the bottom of the channel could move, apply force to the ship, and/or was intelligent, because no force was applied until a certain amount of the ship was in contact.

96. The petitioners were unable to explain why, if the ALVENUS were seaworthy, it is the only vessel to have ever suffered the type of collapse that it did. Although the petitioners made numerous references to the ALVENUS grounding, the testimony of those on board and the lack of damage to the bottom do not support a finding that the ALVENUS did ground. Other vessels that have run hard aground at significant speeds on hard clay or mud in the Calcasieu Channel have suffered only minor damage to their bottom plating, if they were damaged at all. Even if tankers are not designed to run aground, they do run aground, and do so somewhat regularly, without collapsing.

97. The petitioners' theory on how the ALVENUS behaved as she collapsed is that she suffered a "column buckling mode" type of failure: stiffener and deck plate collapsed together as a column by "tripping" at a stress that was below the critical buckling stress of the deck itself.

98. The Court does not accept this explanation for several reasons. First, if the ALVENUS structure had failed in the column mode of buckling, the stress to cause this form of failure is greater than the critical buckling stress of the deck. Naval architects for the petitioners and Conoco finally agreed that the failure occurred below the critical buckling stress of the deck

of approximately 158 N/mm$^2$. This necessarily would eliminate column failure as a possibility.

The appearance of the collapsed structure is the best evidence that this method of failure did not occur. For the deck structure to function as a column in the real world, the longitudinal stiffeners have to be, and remain, attached to the deck plating. Under the circumstances, as the deck starts to buckle and the stiffener/deck column begins to carry the stress, properly attached stiffeners start to "trip," or lay over towards the deck. Stiffeners that are not attached to the deck, however, can move laterally or sideways as the deck buckles. The tripping phenomenon was virtually not seen in the deck of the ALVENUS, in that the vast majority of the stiffeners, including all of the stiffeners over the port wing tank, did not lay over: they moved sideways, still perpendicular to the deck.

Finally, if the stiffeners had stayed attached to the deck so that column buckling occurred, the stiffeners should have been up inside the buckled deck. The stiffeners were found folded in an "S" shape, below and outside the fold of the buckled deck. The column mode of buckling therefore could not have occurred, and the stiffeners must have come detached from the deck early on in the buckling sequence.

VII. Initiation of Casualty

99. The speed at which the ALVENUS, and other comparable ships, normally traverse the Calcasieu Channel results in a "squat," or bodily sinkage, accompanied by a trim down by the bow. This squat tends to put the forward part of the vessel very close to, or lightly in contact with, the channel bottom. This tendency to sink can be resisted by the channel bottom, causing an additional bending effect to the ship. The tendency decreases with decreasing speed. This normal and expected phenomenon was a factor in increasing the bending effect on the ship and the compressive stress in the deck.

100. The ship was subject to a small, slow, unnoticeable, and oscillating pitching

motion, as well as the steady squat. This motion arose because the bottom of the channel was not perfectly flat and because the other forces developed by the passage of the ship were not perfectly steady. This phenomenon also was normal, expected, and a factor in increasing the bending effect on the ship and the compressive stress in the deck.

101. The deck of the ship was exposed to the hot noon sun; the rest of the vessel's structure was at a cooler temperature, being either in contact with the water or the oil cargo. A compressive stress of substantial proportions developed in the deck plating due to the different amounts of thermal expansion of the ship's structural components at the different temperatures. This phenomenon was normal and expected.

102. As the ALVENUS passed up the Channel, all of these forces, as well as the forces of the load of the cargo, were acting on the ship. The ship was close to her limit of strength as she passed up the Channel. The load on the ship was sustained and steady.

103. The ability of the deck structure in the ALVENUS to resist the compressive stress that the normal and expected forces produced was substantially less than would be expected of a seaworthy vessel because of the construction deficiencies of the welds.

104. As the ship passed buoys 19 and 20, some variation in her behavior, probably caused by a change in squat, increased the forces acting on the ship by a small amount. The testimony of those on board and the lack of damage to the bottom plating establish that the increase in force to cause the collapse was very slight. The slight increase in the forces acting on the ship raised the compressive stress in the deck enough to carry the structure into the "elastic buckling" range, where the plating had a tendency to move into an undulating "up and down" pattern across the deck. In a strongly-built structure, this elastic buckling either would have disappeared when the force was removed, or resulted in a slight permanent deformation of the deck plating, which might have been detected at the time. In the ALVENUS, however, the longitudinals over the No. 2 port wing tank detached from the deck plating prematurely because of the defective welds, so that the deck did not develop its designed compressive strength and failed in that area at a lesser stress than designed.

105. Once the failure initiated in the deck over the No. 2 port wing tank at about Frame 183, the strength of the port side deck dropped to near zero, and the remaining deck structure over the No. 2 tanks became greatly overloaded. The failure spread rapidly across the deck to the starboard side and then to the side plating on both sides, and to the interior longitudinal bulkheads in the tanks. The hull collapsed.

106. It is this combination of circumstances that distinguishes the ALVENUS and accounts for her catastrophic failure. No similar ship, while traversing the Calcasieu Channel, under substantially identical conditions, had suffered any damage.

107. The theory that the vessel hit an obstruction or mound of hard material, causing it to fail, is extremely unlikely given that the probability of other vessels having passed over the precise location of the ALVENUS casualty prior to the casualty is 99.5 percent.

*Conclusions of Law*

I. Jurisdiction

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1333. The ALVENUS is before the Court *in rem* to the extent of her stipulation for value as a consequence of the Limitation of Shipowners' Liability Act, 46 U.S.C.App. § 181 and Admiralty Rule F(1), Federal Rules of Civil Procedure. The petitioners' claim against the Corps of Engineers is brought under the Suits in Admiralty Act, 46 U.S.C.App. § 741. The claims of the United States against the petitioners are brought under the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq. All other claims are premised on negligence under the general maritime law.

2. The parties tried their case to the Court. The claimants were not entitled to a jury in this limitation of liability proceeding. *Matter of East River Towing*, 266 U.S. 355, 45 S.Ct. 114, 69 L.Ed. 324 (1924).

## II. Limitation of Liability

3. The determination of whether the petitioners are entitled to limitation is a two-step process. "First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness." *Farrell Lines v. Jones*, 530 F.2d 7, 10 (5th Cir.1976). "Knowledge or privity of *any fact* or act causing the accident is not enough for denial of limitation; it is only knowledge or privity of negligent acts or unseaworthy conditions which trigger a denial of limitation." *Id.*

4. The Court concludes that the ALVENUS was unseaworthy and defective before the commencement of this voyage because of her construction deficiencies.

5. The circumstances that the ALVENUS encountered in the Calcasieu Channel were those that a vessel should expect. A seaworthy vessel is able to withstand certain extremes of weather, perils of the sea, and other predictable conditions without breaking apart. *Mitchell v. Trawler Racer*, 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960); *In re MARINE SULPHUR QUEEN*, 460 F.2d 89 (2d Cir. 1972); *Sabine Towing Co. v. Brennan*, 72 F.2d 490, 494 (5th Cir.1934). The fact that the ALVENUS broke apart under conditions that were not unusual, and that other vessels encountered without difficulty or damage, is evidence of the ALVENUS' unseaworthiness. *In re MARINE SULPHUR QUEEN*, 460 F.2d at 100.

6. In order to limit liability, those seeking to limit have the burden of proving that the unseaworthiness was without their privity or knowledge. *Coryell v. Phipps*, 317 U.S. 406, 409, 63 S.Ct. 291, 292, 87 L.Ed. 363 (1943); *Farrell Lines, Inc.*, 530

F.2d at 10. In the absence of such knowledge, limitation is proper. *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967).

7. The shipowner is chargeable with knowledge of acts or events or conditions of unseaworthiness that could have been discovered through reasonable diligence. *Empresa Lineas Maritimas Argentinas v. United States*, 730 F.2d 153 (4th Cir.1984), *citing Spencer Kellogg Co. v. Hicks*, 285 U.S. 502, 511–12, 52 S.Ct. 450, 452–53, 76 L.Ed. 903 (1932).

8. A shipowner has a duty to use reasonable means to acquire knowledge calculated to inform him of conditions likely to produce or contribute to unseaworthiness. *In re Bankers Trust Co.*, 651 F.2d 160, 171 (3d Cir.1981). In *Bankers Trust*, the district court had to determine whether the shipowner was chargeable with the knowledge that the ship's turbine was damaged. The only manner in which the shipowner could have detected the damage would have been to have performed a crash astern test that was not required. The Captain of the ship, it was found, had written a letter to the management stating that such a test might damage the intricate propulsion system. The Court of Appeals reversed the district court's denial of limitation, suggesting that the owner is not chargeable with knowledge that could be gained only through performance of destructive testing, especially where that testing was not required. *See id.* at 172–73.

9. In *Gibboney v. Wright*, 517 F.2d 1054 (5th Cir.1975), a ship casualty occurred because of a defectively secured tank. Two inspectors examined the boat before it was finished. The first inspector told the builder to strap in the tank, which the builder promised to do. The second inspector did not investigate the fuel tank installation. The builder ultimately failed to secure the tank, but, based on the builder's earlier promise to do so, the surveyors stated in their final report that the tank had been strapped.

The Fifth Circuit granted a limitation of liability, noting four factors that militated against a finding that the owner should have discovered the defect through reasonable inspection. Two of those factors are especially relevant to the ALVENUS petition. First, the boat in *Gibboney* had been sailing for three months under all types of weather conditions with no indication that the recommended work had not been done. Second, there was a very real inaccessibility of the fuel tank. The tank could not be observed without tearing out metal. *Id.* at 1058.

The Fifth Circuit stated that, in light of the combination of circumstances, the district judge was warranted in finding that the owner would not have discovered the defective condition by a reasonably diligent inspection. *Id.* at 1058.

■ 10. The Lloyd's Leasing and Alvenus Shipping petitioners would not have discovered the defective welds within the ALVENUS structure by a reasonably diligent inspection. Knowledge of the defective construction with the welds could have been gained only through the performance of destructive testing. In this instance, Lloyd's Leasing and Alvenus Shipping were not required to conduct such testing.

The Lloyd's Leasing and Alvenus Shipping petitioners are not chargeable with the knowledge of the defective welds. The defects within the manual welds were hidden from them. Their only method of inspecting the welds was a visual examination, which did not reveal the welds' inherent weakness. Moreover, the ALVENUS had made several voyages before making her transit up the Calcasieu Channel without giving these shipowners any indication that the welds over the wing tanks were of poor quality.

11. The Lloyd's Leasing and Alvenus Shipping petitioners' lack of knowledge of the unseaworthy conditions onboard the ALVENUS entitle them to limitation of their liability.

■ 12. Cammell Laird, however, may not limit its liability because, as the ship builder, it had knowledge of the defective construction of the ship. Cammell Laird applied welds that did not achieve adequate fusion or penetration. Moreover, it conducted no testing of the manually applied welds. Thus, Cammell Laird did not use due diligence and the construction deficiencies were within its privity.

13. The M/T ALVENUS was seaworthy in all other aspects. She was built in conformity with Lloyd's Rules, which is evidence that she was considered seaworthy. *Louis Dreyfus Corp. v. 27,946 Long Tons of Corn,* 830 F.2d 1321, 1327 (5th Cir.1987).

■ 14. The Court further concludes that Captain Shipley committed no navigational errors in his transit up the Channel. Consequently, the Court holds Captain Shipley not personally liable because he was following the orders of the ALVENUS' owners' representative, and he was not negligent in following those orders.

III. Petitioners' Claims against Conoco

A. *The Charter Party*

■ 15. The tanker voyage charter party under which the ALVENUS was operating at the time of the casualty contains a "safe berth" clause:

SAFE BERTHING–SHIFTING

The Vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, be at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer.

The safe berth clause protects the master and owner from orders of the charterer that might put the ship in jeopardy, because, under the clause, they can refuse to accept such orders without becoming liable for resulting claims by the charterer. *See* G. Gilmore & C. Black, *The Law of Admiralty* 203–207 (2d ed. 1975).

16. *Bunge Corp. v. M/V FURNESS BRIDGE,* 558 F.2d 790 (5th Cir.1977), states the relevant and applicable law of

the safe berth clause. *FURNESS BRIDGE* involved a conflict between a wharfinger/charter and the owners of a vessel that damaged a dolphin alongside an undersized pier. The Fifth Circuit wrote,

> The parties have cited no case in which this Court has interpreted the customary safe berth clause. The instant case does not afford us the opportunity to hold in favor of either the modern or the traditional view, for we are certain, in the circumstances here present, that the parties could not have intended the safe berth clause, whether by charter party or upon a third party beneficiary theory, to warrant the complete safety of the Bunge wharf. The facility, as it existed at the time when both charter parties were entered into, "was not adequate for vessels the size of the Furness Bridge". It was "unsafe" only in that it was too small for this vessel. Surely none of the parties who might be bound by or claim protection under the safe berth clause intended that Bunge would either rebuild its entire facility or accept absolute liability by virtue of a boilerplate provision. *Under the circumstances, we conclude that there is no contractual liability because of an exception to the safe berth warranty: "When a charter names a port and the master proceeds there without protest, the owner accepts the port as a safe port, and is bound to the conditions that exist there."*

*Id.* at 801–802 (citations omitted) (emphasis added).

■ 17. The petitioners allege that Conoco breached the safe berth clause because Conoco instructed a certain arrival draft, 40 feet in fresh water. The petitioners believe that the Channel was incapable of accommodating the ALVENUS at that draft. The draft and depth, however, are the "conditions that exist[ed] there" of which they complained. The Master of the ALVENUS knew the draft of his ship and that his instructions and the information from the pilot concerning the available depth of the channel were not consistent with what was shown on his charts. He knew that there was a small under keel

clearance and, with a small under keel clearance, there would be an increase of draft due to shallow water effect on the hull. Maneuvering would be slower.

Although the Master knew all of this, he did not protest the conditions, nor ask for lighterage at Conoco's expense as allowed under the safe berth clause of the charter party.

In *FURNESS BRIDGE*, the vessel and her owner were liable for the damages to the berth because the Master knew the size of the wharf and the size of his ship, and did not protest or take into consideration the special needs of the situation. *Bunge Corp.*, 558 F.2d at 802. The Master proceeded without protest; thus, the owner accepted the port as a safe port, and was bound to the conditions that existed there. *Id.*

This Court must apply *FURNESS BRIDGE* here. Conoco is not liable for breach of the safe berth clause by its designation of the port or the draft of the ship in the instructions because of the Master's knowledge of the conditions and because any objection to the designation or instructions was waived by the Master.

■ 18. Even assuming the Master had not accepted the depth of the port and draft of the vessel without objection, thereby waiving the owners' right to object, Conoco had designated a safe berth for the ALVENUS. The safety of a port is to be determined with reference to the vessel and the circumstances surrounding that vessel's use of the port. Examination of the history of usage of the Calcasieu Channel and the conditions on the day the ALVENUS arrived demonstrate that the Channel was safe for a vessel such as the ALVENUS, with a 40 foot draft.

On June 1, 1984, less than two months before the ALVENUS' casualty, the Lake Charles Pilots Association had mailed a notice of the safe draft for transiting the Channel: "The Army Engineers have completed dredging the Outer Bar Channel and the Pilots feel that vessels can safely navigate the channel at a maximum draft of 40 ft. fresh water." Further, the pilots fre-

quently took vessels with 40' drafts through the Channel, none of which had ever sustained hull damage. Finally, the Lake Charles Pilots Association's records reflect that the pilots had been taking vessels of substantially identical size and draft to the ALVENUS or greater, through the Calcasieu Channel on a regular basis for over two years before the casualty. This alone is evidence of the safety of the port for the ALVENUS as loaded. *See H. Schuldt v. Standard Fruit & S.S. Co.,* 1979 A.M.C. 2470, 2477 (S.D.N.Y.1978), citing *Trade Banner Line Inc. v. Caribbean S.S. Co.,* 521 F.2d 229, 230 (5th Cir.1975) and *Esso Standard Oil v. The S.S. Sabrina,* 154 F.Supp. 720, 727 (D.Canal Zone 1957) (the fact that similarly situated vessels, properly navigated and handled, used berths without incident over period of several years, was evidence that berth was actually safe for vessel involved in casualty).

### B. Negligence Cause of Action

19. "[A] time charterer 'who has no control over the vessel, assumes no liability for negligence of the crew or unseaworthiness of the vessel absent a showing that the parties to the charter intended otherwise.' " *In re P & E Boat Rentals, Inc.,* 872 F.2d 642, 647 (5th Cir.1989), *quoting Mallard v. Aluminum Co. of Canada, Inc.,* 634 F.2d 236, 242 n. 5 (5th Cir.), *cert. denied,* 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981). However, this rule does not exempt a time charterer from liability if it is negligent in conducting its activities as time charterer. *P & E Boat Rentals, Inc.,* 872 F.2d at 647.

20. Conoco was not negligent in conducting its activities as time charterer. The petitioners have failed to prove at least one of the four elements.

21. One of the elements that the petitioners must establish to recover on a negligence cause of action is duty, which requires a finding of foreseeability. The defendant must have knowledge that a danger is not merely possible, but probable. *Consolidated Aluminum v. C.F. Bean Corp.,* 833 F.2d 65, 68 (5th Cir.1987), *citing*

*Republic of France v. United States,* 290 F.2d 395 (5th Cir.1961).

The only possible danger to a properly navigated and seaworthy vessel of the size of the ALVENUS with a draft of 40 feet in fresh water coming up the Calcasieu Channel in July, 1984, under normal summer weather conditions, was that it might experience slowing as it came through the "fluff" near the jetties. At the time of the ALVENUS casualty, based on the experience of all fact and expert witnesses on the issue, there was no way for Conoco to have known it was possible for a properly navigated, seaworthy vessel of the size and draft of the ALVENUS to contact the bottom, much less suffer any hull damage under normal weather and tide conditions in the Calcasieu Channel. The damage to the ALVENUS, and subsequent oil spill, were "wholly unprecedented." *See Republic of France,* 290 F.2d at 401. Conoco was not negligent because it was not probable that there would be any damage to a seaworthy vessel with a 40–foot draft.

### IV. Claimants' Claims against Conoco

22. Some of the claimants have alleged that Conoco is liable to them based on tort theories. In this regard, there is a question as to whom the risk of danger might foreseeably extend, just as there is a question as to the foreseeability of the risk. Conoco did not owe the claimants a legal duty because Conoco could not have foreseen or anticipated any harm to this group of persons by Conoco's actions. As in the decisions in *Lloyd's Leasing v. Conoco,* 868 F.2d 1447, 1449–50 (5th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989) and *Consolidated Aluminum,* 833 F.2d at 67–68, the inquiry is the foreseeability of harm *to those claimants* from Conoco's actions.

Conoco could not have foreseen that a 40–foot draft on a seaworthy vessel could result in damage to that seaworthy vessel that would result in an oil spill; therefore, Conoco did not owe a duty to the claimants to change its policy on draft. Vessel groundings on soft bottoms may cause a loss of time to the grounded vessel, possi-

bly require tug assistance, and possibly cause a loss of time to other vessels. It is not reasonably to be anticipated by a voyage charterer when issuing routine instructions to a vessel to go into Louisiana, that it will in any way ever impact those in Texas, many miles away from its terminal or the voyage path of the vessel. *Consolidated Aluminum*, 833 F.2d at 68. Therefore, the claimants are outside the class of persons to whom Conoco may have owed a legal duty when it instructed the ALVENUS to proceed to Lake Charles with a 40-foot draft, and Conoco is not liable to the claimants.

**V. The United States' Claims against Petitioners**

23. The Court has jurisdiction of the United States' claim for reimbursement of its oil pollution clean-up expenses, pursuant to the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1251.

24. Although the United States' claim pursuant to the FWPCA is here consolidated with the shipowner's limitation of liability action, the FWPCA claim is not limitable. *Complaint of Hokkaido Fisheries, Co., Ltd.*, 506 F.Supp. 631 (D.Alaska 1981).

25. The petitioners Lloyd's Leasing, Ltd. and Alvenus Shipping Co., *in personam*, and M/T ALVENUS (now M/T HALIFAX), *in rem*, are strictly liable to the United States for the actual costs of cleanup arising from the ALVENUS casualty. *United States v. Dixie Carriers, Inc.*, 627 F.2d 736 (5th Cir.1980); *United States v. Dixie Carriers, Inc.*, 736 F.2d 180 (5th Cir.1984).

**VI. Petitioners' and Claimants' Claims against the United States**

26. The Court's jurisdiction over claims by claimants and petitioners against the United States is pursuant to the waiver of sovereign immunity in the Suits in Admiralty Act (SAA), 46 U.S.C.App. § 741. *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976). However, claims regarding discretionary acts on the part of the United States are not included in the waiver, and this Court has no jurisdiction to review such acts. *Wiggins v. United States*, 799 F.2d 962 (5th Cir.1986).

27. The current dimensions of the Calcasieu Bar Channel, and those existing at the time of the casualty, were authorized by the River and Harbor Act of 14 July 1960, House Document 436, 86th Cong., 2d Sess. That statute authorizes a channel project depth of –42 feet MLG with a width of 800 feet.

28. The activities of the Corps of Engineers relating to the design of the Calcasieu Bar Channel are, as a matter of law, discretionary and without the jurisdiction of this Court to review. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984); *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); *E. Ritter & Co. v. Department of the Army, Corps of Engineers*, 874 F.2d 1236, 1241 (8th Cir. 1989). In particular, the decisions as to appropriate channel depth and width are made by the Corps based upon policy and economic considerations, including a cost-benefit analysis, weighing the cost to the Government against the benefits anticipated to users of the waterway and the national public interest. This is the type of determination on the part of the United States for which sovereign immunity has not been waived and that is shielded from tort liability. *Dalehite*, 346 U.S. at 15, 73 S.Ct. at 956.

29. Determinations that the Corps made regarding frequency and location of maintenance dredging and surveying in the Bar Channel are, similarly, decisions based on policy considerations properly left to the discretion of the Corps. *Id.* In particular, the types of dredging equipment and surveying equipment used, the method of dredging utilized, both new work and maintenance, the frequency and duration of dredging and surveying, as well as the type of surveys performed and the coverage of such surveys are all discretionary decisions shielded from tort liability. They are deci-

sions made at the policy level for reasons related to balancing the cost effectiveness to the government against benefit to the material interest.

Moreover, even assuming that the Corps had surveyed the Channel more often or more thoroughly, the outcome of this case would not change. The Channel was safe and free from dangerous outcroppings at the site where the ALVENUS broke apart. Even if the surveys had observed the exact site over which the ALVENUS passed at the time of the casualty, no dangerous condition would have been revealed because none existed there.

 30. The Corps had no duty to dredge or survey at any particular location or time, or in any particular manner. *Canadian Pacific (Bermuda), Ltd. v. United States*, 534 F.2d 1165 (5th Cir.1976).

31. Where there is no duty, there can be no breach of duty and, therefore, no negligence. W. Prosser & P. Keeton, *Prosser and Keeton on Torts*, § 30 (5th ed. 1984).

 32. Under these circumstances, the United States breached no duty it may have had to warn petitioners or any other party of certain channel conditions. The United States cannot have breached any duty to warn of something of which it was unaware, because the United States had no knowledge, either actual or constructive, of any hazardous condition within the channel boundaries in the area of the casualty. Accordingly, the United States could not and did not mislead the mariner. *Canadian Pacific (Bermuda), Ltd.*, 534 F.2d at 1165.

 33. The United States issued the controlling depth for the Calcasieu Bar Channel by means of hydrographic bulletins, in January and June 1984. The Corps was under no duty to issue to the petitioners, pilots, or any other party to this litigation more information than that which they issued. Specifically, the Corps was under no duty to provide copies of hydrographic surveys of the Bar Channel to any party.

 34. The burden of proof regarding the existence of any alleged obstruction in the Channel at the location of the casualty rests with petitioners. *Guinan v. Boston,*

*Cape Cod & N.Y. Canal Co.*, 1 F.2d 239 (2d Cir.1924).

 35. The United States' knowledge of a deficiency in the Bar Channel in a location other than that of the casualty does not equate to knowledge of the condition alleged to have caused the casualty. Accordingly, there can be no breach of an obligation of due care in that regard. The fact that the United States was authorized to maintain the Bar Channel within funds that Congress allocated did not amount to a general undertaking by the Corps to conduct sounding or dredging activities at any particular location or any particular time in the Calcasieu Bar Channel. *Canadian Pacific (Bermuda), Ltd.*, 534 F.2d at 1165.

 36. The Corps conducts periodic surveys of the depths and contours of the Channel and makes that information available to persons utilizing the Channel through, *inter alia*, means of semi-annual hydrographic navigation bulletins. The evidence shows that both the controlled and recon surveys, upon which the controlling depths were based, were properly conducted and properly reported. The United States cannot be held liable for pilot error or vessel navigational error, and has no duty to warn against any want of care on the part of the pilots in use of such information. *Chute v. United States*, 610 F.2d 7, 15–16 (1st Cir.1979).

 37. The United States does not ensure safe navigation of any waterway. Accordingly, the mere fact that the subject casualty occurred does not impose liability on the United States. *Canadian Pacific (Bermuda), Ltd.*, 534 F.2d 1165; *Kommanvittselskapet Harwi (Rolf Wigand) v. United States*, 305 F.Supp. 882 (E.D.Pa. 1969), *aff'd*, 467 F.2d 456 (3d Cir.1972). The United States cannot be held liable if arrival drafts are determined to have been excessive for the existing channel conditions because the United States has not undertaken, by statute or otherwise, to set arrival drafts for vessels in the Calcasieu Channel.

38. The Lake Charles Pilots Association in general and Pilot Gillis in particular did not rely on information that the Corps published when setting or recommending arrival drafts for vessels or when determining the speed for vessels transiting the Bar Channel. Accordingly, even if the channel information that the United States disseminated were misleading, no liability can exist because there was no reliance. Restatement (Second) of Torts § 343A (1977).

39. No actions or omissions of the United States in any way caused or contributed to the casualty involving the M/T ALVENUS or any resulting damages. Further, the United States breached no duty that it had to any party to the litigation and therefore cannot be liable for any damages resulting from the casualty.

VII. Liability of Pilots and Captain Malcolm Gillis

40. The Lake Charles Pilots, Inc., the legally incorporated pilot association incorporated under the provisions of Louisiana R.S. 34:1075, did not have the authority to regulate the actions of a pilot while on a vessel. The Board of River Port Pilot Commissioners and Examiners is a regulatory body of pilots that is created by an act of the Louisiana Legislature, R.S. 34:1072. The Lake Charles Pilots, Inc., lacks the legally recognizable power to control the individual pilots in the rendition of their professional services and in this case would not be accountable for any negligence of Captain Malcolm Gillis. *Guy v. Donald*, 203 U.S. 399, 27 S.Ct. 63, 51 L.Ed. 245 (1906); *Port of Seattle v. M/V Maria Rubicon*, 404 F.Supp. 302 (W.D.Wash.1975); *Dampskibsselskabet Atalanta A/S v. United States*, 31 F.2d 961 (5th Cir.1929).

41. The Lake Charles Pilots, Inc., is not liable for the ALVENUS casualty. Neither the Lake Charles Pilots, Inc., nor Captain Malcolm Gillis owed a duty to the third party claimants. The Fifth Circuit stated in *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 68 (5th Cir.1987), that for an act or omission to be foreseeable, harm of a general sort to persons of a general class must have been anticipated by a reasonably thoughtful person as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention. Here, the natural forces of wind and tide produced the damage to the third party claimants. Thus, such damage was an improbable event and an unpredictable occurrence.

Even if the natural forces of the wind and tide had made some damage to the claimants foreseeable, it was not foreseeable to anyone skilled and trained in naval architecture or maritime navigation that a casualty like the ALVENUS casualty would result in a buckling of the deck plate in such a manner as to spill crude oil into the Gulf of Mexico.

42. Accordingly, neither the pilot association nor Captain Gillis have any duty to the third party claimants. Thus, they are not liable. The third party claimants' claims against these two defendants must be dismissed.

VIII. Summary of Liability

A. *Liability of Cammell Laird*

43. Cammell Laird initially is liable to Conoco for having constructed an unseaworthy vessel. The defective construction of the vessel because of faulty welds proximately caused the loss of the crude oil cargo into the Channel. Cammell Laird has been unable to demonstrate that it used due diligence in the application or inspection of the welds; thus, the shipbuilder is not entitled to limitation of its liability to Conoco.

44. Cammell Laird is liable also to some third party claimants. Specifically, Cammell Laird is responsible to those claimants who suffered damage due to the physical intrusion of oil onto their property. As a builder of an oil tanker, Cammell Laird reasonably could have anticipated that if a ship's stiffeners were not welded securely in the tank area, that oil would escape from the ship and be carried by the tide to the land. Cammell Laird's privity

with regard to the defective welds precludes it from limiting its liability.

45. Cammell Laird is not liable to Conoco under the Carriage of Goods by Sea Act, 46 U.S.C.App. §§ 1300–1315 (COGSA), because Cammell Laird is not a carrier as defined in the Act. COGSA defines "carrier" to include the "owner or charterer who enters into a contract of carriage with a shipper." 46 U.S.C.App. § 1301(a). When a bill of lading is signed by the charterer or its agent "for the Master" but without the authority of the shipowner, the shipowner is not personally bound and does not by virtue of the charterer's signature become a COGSA carrier. *Pacific Employers Ins. Co. v. M/V GLORIA*, 767 F.2d 229, 237 (5th Cir.1985), *citing Associated Metals & Minerals Corp. v. S.S. PORTORIA*, 484 F.2d 460, 462 (5th Cir.1973); 46 U.S.C.App. § 1301(a). Neither Cammell Laird Shipbuilders, Ltd., nor Lloyd's Leasing, Ltd., issued bills of lading or entered into contracts of carriage. Thus, neither Cammell Laird nor Lloyd's Leasing were carriers subject to liability under COGSA.

*B. Liability of Alvenus Shipping Company, Limited*

46. Conoco may not recover from Alvenus Shipping, the carrier, under COGSA, because Alvenus Shipping has established a COGSA exemption.

To avoid liability as the carrier, the petitioner has the burden of showing that the cargo loss was brought about by one of the excepted causes listed in § 1304 of COGSA. *Fireman's Fund Ins. Cos. v. M/V VIGNES*, 794 F.2d 1552, 1555 (11th Cir. 1986), *citing Compagnie de Navigation v. Mondial United Corp.*, 316 F.2d 163 (5th Cir.1963). Alvenus Shipping will not be liable for the damages caused by the unseaworthiness of the ALVENUS "unless caused by want of due diligence on the part of the carrier to make the ship seaworthy." 46 U.S.C.App. § 1304(1). *M/V VIGNES*, 794 F.2d at 1555.

Other exemptions for the carrier in § 1304(2) include: (a) Act, neglect, or default of the master or pilot or servants of the carrier in the navigation or management of the ship; (c) Perils, dangers, and accidents of the sea; (p) Latent defects not discoverable by due diligence; and (q) Any other cause arising without the actual fault and privity of the carrier. 46 U.S.C.App. § 1304(2).

Alvenus Shipping has met its burden of proving that the damages were caused by an excepted cause listed in § 1304 of COGSA. Alvenus Shipping is not liable to Conoco under COGSA because the unseaworthiness was caused by latent defects not discoverable by due diligence. 46 U.S.C.App. § 1304(2)(p). The loss was caused by the defective welds that were applied in the course of the construction of the ALVENUS. Once the welds were applied, it was impossible for Alvenus Shipping to have known of their inadequacies. Thus, Alvenus Shipping was unaware of the condition and must be exempted from COGSA liability.

47. Alvenus Shipping's lack of knowledge of the unseaworthy condition caused by the faulty welds entitles it to limit its liability for the ALVENUS casualty. Alvenus Shipping had no way of ascertaining the strength of the welds once they were applied and, thus, cannot be held accountable for the latent defective condition of the ALVENUS. This Court will grant limitation of Alvenus Shipping's liability to Conoco and those claimants who have suffered physical intrusions of oil onto their property.

48. Alvenus Shipping is liable to the United States, pursuant to the FWPCA, for the clean up expenses incurred as a result of the ALVENUS rupture.

*C. Liability of Lloyd's Leasing*

49. Lloyd's Leasing is not liable to Conoco under COGSA because it was not a carrier as defined in the Act.

50. Lloyd's Leasing is entitled to limit its liability to Conoco and the claimants who have suffered physical intrusions of oil onto their property, because it did not know of the latent defects that caused the unseaworthiness of the ALVENUS.

51. Lloyd's Leasing is liable to the United States, pursuant to the FWPCA, for the clean up expenses incurred as a result of the ALVENUS rupture.

52. If any of the foregoing findings of fact constitute conclusions of law, they are adopted as such. If any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.

### ORDER AND AMENDED CONCLUSIONS OF LAW

Before the Court is the petitioners Alvenus Shipping Co., Ltd.'s and Lloyd's Leasing Ltd.'s motion for amendment of findings of fact and conclusions of law and all the responses, replies, and rejoinders to that motion. Upon consideration of all arguments with regard to the motion for amendment, the Court herein enters its amended conclusions pursuant to Federal Rule of Civil Procedure 52(b).

1. *Conclusion of Law No. 47 of the Court's June 26, 1990 Findings of Fact and Conclusions of Law is VACATED and the following Conclusion ENTERED:*

The Court has found that Alvenus Shipping Co., Ltd., could not have ascertained the strength of the welds once they were applied; thus, Alvenus Shipping cannot be held accountable for the latent defective condition of the ALVENUS. Alvenus Shipping, therefore, is not liable for the unseaworthy condition of the vessel and is exonerated from liability in this proceeding.

Liability is the threshold issue to be resolved in a limitation of liability action because the exploration as to limitation is materially relevant only if liability is established. The unseaworthy condition of the vessel creates liability for damages only under certain conditions. The vessel's owners may be strictly liable by law if a special relation exists between the vessel and those injured. This is the case when the vessel's crewmembers are injured as a result of the ship's unseaworthy condition. Liability also may arise from negligence as determined by general maritime tort law principles. Finally, the unseaworthy vessel

may be liable if the ship owner breaches a contractually imposed obligation.

In this case, neither strict liability nor contractually imposed liability as to Alvenus Shipping has been established by the construction defects in the ALVENUS. Thus, the only theory under which Alvenus Shipping can be held liable is a negligence theory, upon a showing of a duty to Conoco and the claimants, a breach of that duty, proximate cause, and damages.

Neither Conoco nor the claimants have been able to establish the requisite elements of negligence to hold Alvenus Shipping liable. As stated above, Alvenus Shipping could not have discovered the defective welds within the ALVENUS by a reasonable, diligent inspection, and such inspection was not required of Alvenus Shipping. Thus, the company was not negligent and not liable to Conoco in tort. Alvenus Shipping Co., Ltd., is exonerated from liability.

Similarly, Alvenus Shipping is not liable to those claimants who have suffered physical intrusions of oil onto their property because it was not negligent and because Alvenus Shipping Co., Ltd., does not owe a warranty of seaworthiness to the third-party claimants. A warranty of seaworthiness exists only in favor of seamen, in certain charter agreements, and in favor of a limited class of maritime workers who are not covered by the Longshore and Harbor Workers' Compensation Act. Schoenbaum *Admiralty & Maritime Law* § 4–5 (1987). The third-party claimants are not seamen, they did not charter the vessel, and they do not fall within a class of certain maritime workers to whom the warranty of seaworthiness traditionally has applied. Therefore, the unseaworthy condition of the ALVENUS as found by the Court cannot be attributed, as a matter of law, to Alvenus Shipping Co., Ltd.

2. *Conclusion of Law No. 50 of the Court's June 26, 1990 Findings of Fact and Conclusions of Law is VACATED and the following conclusion ENTERED:*

Lloyd's Leasing is likewise exonerated from liability for the same reasons as stat-

**1142**

ed with regard to Alvenus Shipping Co., Ltd. The Court has concluded that Lloyd's Leasing would not have discovered the defective welds within the ALVENUS by a reasonable and diligent inspection and that such inspection was not required of Lloyd's Leasing. Lloyd's Leasing is not chargeable with knowledge of the defective welds. Accordingly, Lloyd's Leasing was not negligent with respect to the ALVENUS casualty. Lloyd's Leasing did not owe a duty to ensure that the welds were safe to Conoco or the claimants. Lloyd's Leasing cannot be held liable under any other theory; thus, it is exonerated from liability.

*3. The following Conclusions of Law are ENTERED:*

A. Liability of Silver Line, Ltd.

▉▉▉▉ The only relationship Silver Line, Ltd., had to the M/T ALVENUS is that Silver Line, Ltd., was Captain Shipley's direct employer, and Silver Line, Ltd., acted as agent for Alvenus Shipping Co., Ltd. Inasmuch as the Court has found that Captain Shipley bears no responsibility for the ship casualty and oil spill incident, that Captain Shipley was qualified to serve as a Master, and that there was proper monitoring of the performance of Captain Shipley and the other officers who served onboard the M/T ALVENUS, the Court must conclude that Silver Line, Ltd., is not responsible for the casualty of July 30, 1984. Silver Line, Ltd., therefore, is not liable to any of the claimants who have filed third-party claims against it.

B. Liability of Silver Navigation, Ltd.

Although some claimants have filed a third-party action against Silver Navigation, Ltd., no testimony was offered as to Silver Navigation, Ltd.'s, involvement with the M/T ALVENUS or its responsibility for the casualty and oil spill. Silver Navigation, Ltd., had no connection with the operation of the M/T ALVENUS or the employment of the Master/Officers of the M/T ALVENUS, and did not own, manage, nor charter the M/T ALVENUS. Accordingly, Silver Navigation, Ltd., is not liable to any of the claimants who have filed third-party claims against it in this action.

*4. Conclusion*

It is ORDERED, ADJUDGED, and DECREED that Alvenus Shipping Co., Ltd.'s and Lloyd's Leasing Ltd.'s motion for amendment of Findings of Fact and Conclusions of Law is GRANTED IN PART and DENIED IN PART. It is ORDERED that Conclusions of Law Nos. 47 and 50 of the Court's June 26, 1990 Findings of Fact and Conclusions of Law are VACATED and Conclusions of Law No. 1 and 2 set out above SUBSTITUTED. It is further ORDERED that Conclusions of Law 3A. and 3B. as set out above are APPENDED to the Court's Findings of Fact and Conclusions of Law. All relief not expressly granted herein is DENIED.